STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

AJAY KRISHNAMURTHY (CABN 305533)
KEVIN J. BARRY (CABN 229748)
LINA Y. PENG (NYBN 5150032)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 17-0533 EMC |
| Plaintiff, | |
| v. | **UNITED STATES' TRIAL MEMORANDUM** |
| JONATHAN JOSEPH NELSON, et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

I.      CASE STATUS ................................................................................................................1

II.     THE CHARGED OFFENSES ........................................................................................1

III.    STATEMENT OF FACTS .............................................................................................2

        A.      The Sonoma County Hells Angels Enterprise (HASC) ................................2

        B.      Violence and HASC Rivals ...............................................................................3

        C.      HASC Violence on Other Motorcycle Clubs and the Public .......................5

        D.      HASC and Murder ............................................................................................7

        E.      The VICAR Murder of Joel Silva .....................................................................7

        F.      HASC Witness Intimidation .............................................................................9

        G.      HASC and Extortion .......................................................................................10

        H.      HASC and Drug Trafficking ..........................................................................11

IV.     APPLICABLE STATUTES ..........................................................................................11

        A.      18 U.S.C. § 1962 (d) (RICO Conspiracy) (Count 1) .....................................11

                1.      Statutory Language ..............................................................................11

                2.      Applicable Law .....................................................................................11

                        (i)     RICO Conspiracy ......................................................................11

                        (ii)    Enterprise ..................................................................................14

                        (iii)   Employed by or Associated with the Enterprise .................15

                        (iv)    Conducted or Participated in the Affairs of the Enterprise .....15

                        (v)     Pattern of Racketeering Activity ............................................16

                        (vi)    Effect on Interstate Commerce ...............................................16

                        (i)     Evidence of Uncharged Crimes is Admissible .....................16

        B.      18 U.S.C. § 1959(a) (Violent Crime in Aid of Racketeering) (Counts 2, 3, and 6) .....................................................................................................................17

                1.      Statutory Language ..............................................................................18

        C.      18 U.S.C. § 2 (Aiding and Abetting) ..............................................................18

                1.      Statutory Language ..............................................................................18

|   |   | 2. | Applicable Law | 18 |
|   | D. | | Conspiracies | 19 |
|   |   | 1. | The Agreement | 19 |
|   |   | 2. | Participation in the Conspiracy | 19 |
|   |   | 3. | Liability for Co-Conspirator Acts | 20 |
|   |   | 4. | Proof of Conspiracy | 20 |
|   |   | 5. | Co-conspirator Declarations | 21 |

**V.** EVIDENTIARY ISSUES ........................................................................... 23

|   | A. | | Admissibility of Physical Evidence | 23 |
|   |   | 1. | Authentication and Identification/ Chain of Custody | 23 |
|   |   | 2. | Photographs | 24 |
|   |   | 3. | Items Found In A Defendant's Possession | 24 |
|   |   | 4. | Duplicates | 25 |
|   |   | 5. | Business Records | 25 |
|   |   | 6. | Self-Authenticating Records | 26 |
|   |   | 7. | Charts and Summaries | 27 |
|   | B. | | Admissibility of Witness Testimony | 29 |
|   |   | 1. | Direct and Adopted Admissions by Party Opponent | 29 |
|   |   | 2. | Confession of a Co-Defendant/*Bruton* Considerations | 30 |
|   |   | 3. | Hearsay | 31 |
|   |   |   | (i)   Definition | 31 |
|   |   |   | (ii)  Statements Not Introduced for the Truth of the Matter Asserted (e.g., Effect on Hearer) | 31 |
|   |   |   | (iii) State of Mind Exception | 32 |
|   |   |   | (iv)  Prior Inconsistent Statements | 32 |
|   |   |   | (v)   Prior Consistent Statements | 32 |
|   |   | 4. | Hostile Witnesses | 33 |
|   |   | 5. | Witness Invocation of The Fifth Amendment Right Against Self Incrimination | 33 |

6.      Cross-Examination of Defendant .................................................................34

7.      Cross Examination - General Witnesses ......................................................35

8.      Defendant's Character Witnesses ................................................................35

9.      Defendant's Testimony Regarding Character/Impeachment By Contradiction................................................................................................36

C.      Miscellaneous ........................................................................................................37

1.      Judicial Notice ............................................................................................37

2.      Reciprocal Discovery ..................................................................................37

3.      Waiver of Rule 12(b) Motions ....................................................................37

1

## TABLE OF AUTHORITIES

2

### CASES

3    *Act Up!/Portland v. Bagley*, 988 F.2d 868 (9th Cir. 1993)............................................................ 25

4    *Barsky v. United States*, 339 F.2d 180 (9th Cir. 1964) ................................................................ 27

5    *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003) ........................................................................ 37

6    *Blumenthal v. United States*, 332 U.S. 539 (1947)...................................................................... 19

7    *Bourjaily v. United States*, 483 U.S. 171 (1987)                                                         21, 25

8    *Bruton v. United States*, 391 U.S. 123 (1968) ...................................................................... 30, 31

9    *Crawford v. Washington*, 541 U.S. 36 (2004) ................................................................ 21, 30, 31

10   *Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*, 466 F.2d
          722 (7th Cir. 1972)............................................................................................................ 29

11   *Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960) .............................................................. 24

12   *Garlington v. O'Leary*, 879 F.2d 277 (7th Cir. 1989) ................................................................ 22

13   *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)............................................ 16

14   *Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467 (11th Cir. 1984)............................................ 33

15   *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702 (9th Cir. 1989) ........................................ 25

16   *La Porta v. United States*, 300 F.2d 878 (9th Cir. 1962)............................................................ 26

17   *Lucero v. Stewart*, 892 F.2d 52 (9th Cir. 1989) ........................................................................ 24

18   *Michelson v. United States*, 335 U.S. 469 (1948).............................................................. 35, 36

19   *Microsoft v. Odom*, 486 F.3d 541 (9th Cir. 2007) .................................................................... 14

20   *Ohio v. Roberts*, 448 U.S. 56 (1980).......................................................................................... 25

21   *Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953 (9th Cir. 2001) .................................................... 31

22   *Pinkerton v. United States*, 328 U.S. 640 (1946)........................................................................ 20

23   *Reves v. Ernst & Young*, 507 U.S. 170 (1993)............................................................................ 15

24   *Reyes v. United States*, 383 F.2d 734 (9th Cir. 1967)................................................................ 24

25   *Richardson v. Marsh*, 481 U.S. 200 (1987) ................................................................................ 30

26   *Rosemond v. United States*, 134 S.Ct. 1240 (2014).................................................................... 18

27   *Salinas v. United States*, 552 U.S. 52, 65 (1997) .......................................................... 11, 12, 13

28

U.S. TRIAL MEMO.
CR 13-00764 WHO

*Securities Exchange Commission v. Franklin*, 348 F. Supp. 2d 1159 (S.D. Cal. 2004) .................................................................................................................. 26

*See United States v. Young*, 248 F.3d 260 (4th Cir. 2001) ...................................... 37

*Sendejas v. United States*, 428 F.2d 1040 (9th Cir. 1970) ...................................... 21

*ted States v. Santana-Camacho*, 931 F.2d 966 (1st Cir. 1991) .............................. 35

*United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974) ............................................ 28

*United States v. Abushi*, 682 F.2d 1289 (9th Cir. 1982) .......................................... 19

*United States v. Allen*, 425 F.3d 1231 (9th Cir. 2005) ............................................ 31

*United States v. Antelope*, 395 F.3d 1128 (9th Cir. 2005) ................................. 33, 34

*United States v. Arambula-Ruiz*, 987 F.2d 599 (9th Cir. 1993) .............................. 22

*United States v. Arias-Villanueva*, 998 F.2d 1491 (9th Cir. 1993) ......................... 22

*United States v. Armijo*, 5 F.3d 1229 (9th Cir. 1993) ............................................. 32

*United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981) ...................................... 16

*United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993) ............................................ 28

*United States v. Bao*, 189 F.3d 860 (9th Cir. 1999) ............................................... 32

*United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979) ........................................... 23

*United States v. Barnett*, 667 F.2d at 835 (9th Cir. 1982) ...................................... 18

*United States v. Baxter*, 492 F.2d 150 (9th Cir. 1973) ........................................... 19

*United States v. Becker*, 720 F.2d  1033 (9th Cir. 1983) ........................................ 19

*United States v. Bibero*, 749 F.2d 586 (9th Cir. 1984) ........................................... 20

*United States v. Black*, 767 F.2d 1334 (9th Cir. 1985) ...................................... 23, 34

*United States v. Blackwell*, 694 F.2d 1325 (D.C. Cir. 1982) .................................. 23

*United States v. Blackwood*, 878 F.2d 1200 (9th Cir. 1989) ................................... 23

*United States v. Boone*, 951 F.2d 1526 (9th Cir. 1991) .......................................... 18

*United States v. Boyle*, 556 U.S. 938 (2009) ................................................... 14, 15

*United States v. Bridgeforth*, 441 F.3d 864, 869 (9th Cir. 2006) ........................... 31

*United States v. Brooks*, 473 F.2d 817 (9th Cir. 1973) ........................................... 31

*United States v. Burreson*, 643 F.2d 1344 (9th Cir. 1991) ..................................... 29

*United States v. Castro*, 887 F.2d 998 (9th Cir. 1987) ........................................... 31

1    *United States v. Castro*, 972 F.2d 1107 (9th Cir. 1992) ........................................... 20

2    *United States v. Catabran*, 836 F.2d 453 (9th Cir. 1982) ....................................... 28

3    *United States v. Chu Kong Yin,* 935 F.2d 990 (9th Cir. 1991) ............................... 23

4    *United States v. Cloud*, 872 F.2d 846 (9th Cir. 1989) ............................................ 18

5    *United States v. Collicott*, 92 F.3d 973 (9th Cir. 1996) ..................................... 30, 32

6    *United States v. Corrado*, 286 F.3d 934 (6th Cir. 2002) ........................................ 13

7    *United States v. Crespo de Llano*, 838 F.2d 1006 (9th Cir. 1987) ......................... 21

8    *United States v. Cuozzo*, 962 F.2d 945 (9th Cir. 1992) .......................................... 34

9    *United States v. De Bright*, 730 F.2d 1255 (9th Cir. 1984) .................................... 24

10   *United States v. De Peri*, 778 F.2d 963 (3rd Cir. 1985) ......................................... 27

11   *United States v. Delgado*, 401 F.3d 290 (5th Cir. 2005) ........................................ 15

12   *United States v. Doe*, 125 F.3d 1249 (9th Cir. 1997) ............................................. 34

13   *United States v. Echeverry*, 759 F.2d 1451 (9th Cir. 1985) .................................... 22

14   *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978) .................................... 13

15   *United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) ..................... 12, 15, 16

16   *United States v. Fernandez*, 839 F.2d at 639 (9th Cir. 1988) ................................. 30

17   *United States v. Fleishman*, 684 F.2d 1329 (9th Cir. 1982) .............................. 20, 21

18   *United States v. Franco*, 874 F.2d 1136 (7th Cir. 1989) ........................................ 25

19   *United States v. Frederick*, 78 F.3d 1370 (9th Cir. 1996) ...................................... 32

20   *United States v. Gabriele*, 63 F.3d 61 (1st Cir. 1995) ........................................... 15

21   *United States v. Gardner*, 611 F.2d 770 (9th Cir. 1980) ........................................ 28

22   *United States v. Garza*, 980 F.2d 546 (9th Cir. 1992) ........................................... 19

23   *United States v. Gay*, 967 F.2d 322 (9th Cir. 1992) ............................................... 34

24   *United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979) ........................................... 36

25   *United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991) .......................................... 13

26   *United States v. Gonzalez*, 921 F.2d 1530 (11th Cir. 1991) ................................... 13

27   *United States v. Goode*, 814 F.2d 1353 (9th Cir. 1987) ......................................... 33

28   *United States v. Guzman*, 849 F.2d 447 (9th Cir. 1988) ........................................ 19

1   *United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991) ................................................................ 23, 24

2   *United States v. Hathaway*, 798 F.2d 902 (6th Cir. 1986) ........................................................................ 25

3   *United States v. Hegwood*, 977 F.2d 492 (9th Cir. 1992) ........................................................................ 19

4   *United States v. Henderson*, 241 F.3d 638 (9th Cir. 2000) ...................................................................... 24

5   *United States v. Hernandez*, 876 F.2d 774 (9th Cir. 1989) ...................................................................... 18

6   *United States v. Hoffman*, 341 U.S. 479 (1951) ...................................................................................... 33

7   *United States v. Hubbard*, 96 F.3d 1223 (9th Cir. 1996) ........................................................................ 19

8   *United States v. Huber*, 772 F.2d 585 (9th Cir. 1985) ............................................................................ 26

9   *United States v. Jimenez Recio*, 537 U.S. 270 (2003) ............................................................................ 20

10   *United States v. Johnson*, 594 F.2d 1253 (9th Cir. 1979 ........................................................................ 27

11   *United States v. Kaiser*, 660 F.2d 724 (9th Cir. 1981) ............................................................................ 24

12   *United States v. King*, 472 F.2d 1 (9th Cir. 1973) .................................................................................. 23

13   *United States v. Krasn*, 614 F.2d 1229 (9th Cir. 1980) .......................................................................... 20

14   *United States v. Krasovich*, 819 F.2d 253 (9th Cir. 1987) ...................................................................... 19

15   *United States v. Layton*, 720 F.2d 548 (9th Cir. 1983) .......................................................................... 22

16   *United States v. Leal*, 509 F.2d 122 (9th Cir. 1975) .............................................................................. 25

17   *United States v. Lechuga*, 888 F.2d 1472 (5th Cir. 1989) .................................................................. 22, 23

18   *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983) ...................................................................... 29

19   *United States v. Lewis*, 787 F.2d 1318 (9th Cir. 1986) .......................................................................... 20

20   *United States v. Loya*, 807 F.2d 1483 (9th Cir. 1987) ............................................................................ 21

21   *United States v. Mann*, 811 F.2d 495 (9th Cir. 1987) ............................................................................ 18

22   *United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) .............................................................................. 30

23   *United States v. Marino*, 277 F.3d 11 (1st Cir. 2002) ............................................................................ 15

24   *United States v. McCollom*, 664 F.2d 56 (5th Cir. 1981) ........................................................................ 36

25   *United States v. McCown*, 711 F.2d 1441 (9th Cir. 1983) ...................................................................... 31

26   *United States v. McKoy*, 771 F.2d 1207 (9th Cir. 1985) ........................................................................ 18

27   *United States v. Meyers*, 847 F.2d 1408 (9th Cir. 1988) ........................................................................ 27

28   *United States v. Miller*, 874 F.2d 1255 (9th Cir. 1989) .......................................................................... 31

1   *United States v. Miller*, 984 F.2d 1028 (9th Cir. 1993) .................................................. 37

2   *United States v. Murray*, 751 F.2d 1528 (9th Cir. 1985) ............................................... 19

3   *United States v. Nakai*, 413 F.3d 1019 (9th Cir. 2005) .................................................. 29

4   *United States v. Natale*, 526 F.2d 1160 (2d Cir. 1975) .................................................. 23

5   *United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001) ............................................. 13

6   *United States v. Nixon*, 418 U.S. 683 (1974) ................................................................ 22

7   *United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995) ............................................. 20, 28

8   *United States v. Oreto*, 37 F.3d 739 (1st Cir. 1994) ..................................................... 15

9   *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000) ................................................. 29

10  *United States v. Ospina*, 739 F.2d 448 (9th Cir. 1984) ............................................ 24, 29

11  *United States v. Pacheco-Lovio*, 463 F.2d 232 (9th Cir. 1972) ..................................... 25

12  *United States v. Persico*, 832 F.2d 705 (2d Cir. 1987) .................................................. 13

13  *United States v. Poschatta*, 829 F.2d 1477 (9th Cir. 1987) ........................................... 28

14  *United States v. Quintero-Barraza*, 78 F.3d 1344 (9th Cir. 1996) ................................ 37

15  *United States v. Radseck*, 718 F.2d 233 (7th Cir. 1983) ................................................ 27

16  *United States v. Ray*, 930 F.2d 1368 (9th Cir. 1990) ..................................................... 25

17  *United States v. Reed*, 726 F.2d 570 (9th Cir. 1984) ..................................................... 20

18  *United States v. Reese*, 775 F.2d 1066 (9th Cir. 1985) .................................................. 19

19  *United States v. Rubino*, 431 F.2d 284 (6th Cir. 1970) .................................................. 27

20  *United States v. Saavedra*, 684 F.2d 1293 (9th Cir. 1982) ............................................ 20

21  *United States v. Santiago*, 837 F.2d 1545 (11th Cir. 1988) ........................................... 23

22  *United States v. Schmit*, 881 F.2d 608 (9th Cir. 1989) .................................................. 22

23  *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980) ...................................................... 16

24  *United States v. Shirley*, 884 F.2d 1130 (9th Cir. 1989) ............................................... 28

25  *United States v. Skillman*, 922 F.2d 1370 (9th Cir. 1990) ............................................. 25

26  *United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005) ................................................ 13

27  *United States v. Smith*, 893 F.2d 1573 (9th Cir. 1990) .................................................. 24

28  *United States v. Soulard*, 730 F.2d 1292 (9th Cir. 1984) ............................................... 29

*United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076 (9th Cir. 1982) ................................................................................................................. 21

*United States v. Stauffer*, 922 F.2d 508 (9th Cir. 1990) ................................... 19

*United States v. Stuart*, 718 F.2d 931 (9th Cir. 1983) ..................................... 32

*United States v. Sutton*, 426 F.2d 1202 (D.C. Cir. 1969) ................................. 23

*United States v. Thomas*, 586 F.2d 123 (9th Cir. 1978) ................................... 19

*United States v. Tille*, 729 F.2d 615 (9th Cir. 1984) ........................................ 22

*United States v. Torres Lopez*, 851 F.2d 520 (1st Cir. 1988) ........................... 13

*United States v. Turkette*, 452 U.S. 576 (1981) .............................................. 14

*United States v. Umagat*, 998 F.2d 770 (9th Cir. 1993) ................................... 20

*United States v. Vaccaro*, 816 F.2d 443 (9th Cir. 1987) .................................. 18

*United States v. Valles-Vallencia*, 811 F. 2d 1232 (9th Cir. 1987) .................. 29

*United States v. Vasquez*, 858 F.2d 1387 (9th Cir. 1988) ................................ 20

*United States v. Vaughn*, 797 F.2d 1485 (9th Cir. 1986) ................................. 18

*United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998) ................................ 34

*United States v. Vega-Limon*, 548 F.2d 1390 (9th Cir. 1977) ......................... 20

*United States v. Williams*, 989 F.2d 1061 (9th Cir. 1993) ............................... 22

*United States v. Wood*, 943 F.2d 1048 (9th Cir. 1991) .................................... 28

*United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988) ............................ 22

*United States v. Zavala-Serra*, 853 F.2d 1512 (9th Cir. 1988) ................. 21, 22

**STATUTES**

18 U.S.C. § 1959(a) ......................................................................................... 17

18 U.S.C. § 1961(4) ......................................................................................... 14

18 U.S.C. § 1961(5) ......................................................................................... 16

18 U.S.C. § 2 .................................................................................................... 18

18 U.S.C. § 371 ................................................................................................ 13

**RULES**

Fed. R. Crim. Pro. 12 ....................................................................................... 37

Fed. R. Evid. 1003 ........................................................................................... 25

Fed. R. Evid. 1004(1) ....................................................................................................... 28

Fed. R. Evid. 104(a) ......................................................................................................... 25

Fed. R. Evid. 201 ............................................................................................................. 37

Fed. R. Evid. 405(a) ......................................................................................................... 36

Fed. R. Evid. 608 ............................................................................................................. 35

Fed. R. Evid. 611(c) ......................................................................................................... 33

Fed. R. Evid. 613 ............................................................................................................. 32

Fed. R. Evid. 801(c) ......................................................................................................... 31

Fed. R. Evid. 801(d)(1) ..................................................................................................... 32

Fed. R. Evid. 801(d)(1)(B) ............................................................................................... 32

Fed. R. Evid. 801(d)(2) ............................................................................................... 29, 30

Fed. R. Evid. 801(d)(2)(A) ............................................................................................... 29

Fed. R. Evid. 801(d)(2)(E) ......................................................................................... 21, 22

Fed. R. Evid. 803(3) ......................................................................................................... 31

Fed. R. Evid. 803(6) ................................................................................................... 25, 26

Fed. R. Evid. 901(a) ......................................................................................................... 23

Fed. R. Evid. 902(11) ....................................................................................................... 26

# TRIAL MEMORANDUM

## I.    CASE STATUS

The trial in the above-captioned matter is set to begin with jury selection on April 11, 2022, at 8:30 a.m.  Opening statements will begin on April 18, 2022, at 8:45 a.m.  The Court has already conducted its pretrial conferences, but there is a hearing on "bellwether exhibits," some aspects of jury instructions, and some aspects of juror voir dire on April 6, 2022, and a hearing to address potential cause challenges to prospective jurors based on responses to a juror questionnaire scheduled for April 8 and, both at 9:00 a.m.

The government currently estimates that trial will last into mid-June 2022.  This is a conservative estimate, and it is possible that trial will conclude in advance of that date.  The government's current witness list (filed under seal on January 7, 2022) is its best effort to include all potential witnesses given that we do not know how the defendants will defend the charges and we will not know whether it will be necessary to call multiple witnesses on a single point until after cross-examination.  The government is hopeful that many of the witnesses on its list will be unnecessary if the defense stipulates to chain of custody and authentication for physical items that were seized during searches and for extractions of seized electronic devices.  The government believes that there should be little dispute regarding these issues, but the defense has not yet agreed to a stipulation.  Given the anticipated length of trial and uncertainty regarding witness availability and the specific dates of anticipated testimony, the government also included several officers for certain incidents to ensure an appropriate witness will be available at the appropriate time.

## II.    THE CHARGED OFFENSES

The Second Superseding Indictment (the indictment) contains twelve (12) counts.  The defendants in the first trial group are charged as follows.

1.  Defendant Jonathan Nelson (a/k/a "Jon Jon"):

      a.  RICO conspiracy (Count 1);

      b.  Murder in aid of racketeering of Joel Silva (Count 3);

      c.  Conspiracy to commit murder in aid of racketeering of Joel Silva (Count 2);

      d.  Assault with a dangerous weapon in aid of racketeering of Victim 5 (Count 6);

and

e.  Use / possession of a firearm during a crime of violence (Count 7).

2.  <u>Defendant Brian Wayne Wendt:</u>

a.  RICO conspiracy (Count 1);

b.  Murder in aid of racketeering of Joel Silva (Count 3); and

c.  Conspiracy to commit murder in aid of racketeering of Joel Silva (Count 2).

3.  <u>Defendant Russell Taylor Ott (a/k/a/ "Rusty"):</u>

a.  RICO conspiracy (Count 1);

b.  Murder in aid of racketeering of Joel Silva (Count 3); and

c.  Conspiracy to commit murder in aid of racketeering of Joel Silva (Count 2).

## III.    STATEMENT OF FACTS

The government intends to introduce evidence at trial to establish the following facts, among others:

### A.    The Sonoma County Hells Angels Enterprise (HASC)

The racketeering enterprise charged in the Indictment is the Sonoma County charter of the Hells Angels Motorcycle Club (HASC).  HASC is a violent motorcycle gang with members operating in Sonoma County.  It as has been in existence since the 1970s.  The evidence at trial will show that the enterprise was engaged in murder, assault, robbery, extortion, witness intimidation, drug trafficking, weapons possession, and fraud, among other things.

The evidence at trial will also show that HASC members worked cooperatively with other Hells Angels charters to engage in criminal activity and to assist one another in avoiding detection by law enforcement.  Among the Hells Angels charters with whom HASC enjoyed close relationships were the Fresno and Salem Hells Angels.  Members of HASC and members of these charters, including Brian Wendt, president of Fresno, and Christopher Ranieri, president of Salem, enjoyed close personal relationships.  These bonds were demonstrated, among other ways, through expressions of support and admiration, through frequent visits, through celebration of anniversaries of Hells Angels membership, and through exchange of patches distinct to particular charters, such as the "Young Guns" tag from HASC and the "Soldier" tag from Ranieri and Salem.

1    HASC styles itself as a democracy, under the principle of "one man / one vote," but it has a

2    defined leadership structure, with officers such as president, vice-president, sergeant-at-arms, secretary,

3    and treasurer.  The president has influence over the enterprise, in organizing events, in setting the

4    direction of the charter, in addressing potential threats from rivals, etc.  Further, some members had

5    outsized influence, such as Raymond Foakes.  Foakes took the president role from Defendant Ott in the

6    early 2000s, and although he had to surrender the title to defendant Nelson because of several periods of

7    incarceration, Foakes still has significant influence because he is a nationally prominent Hells Angel.

8    Foakes is famous within the enterprise because he sparked a riot between Hells Angels and the rival

9    outlaw motorcycle gang the Mongols in Laughlin, Nevada in April 2002.[1]  That incident left one

10   Mongol and two Hells Angels dead and over a dozen victims injured.

11   Foakes also had influence within HASC because he was an adept fighter.  Disputes within

12   HASC—and among Hells Angels generally—are frequently resolved through one-on-one fights between

13   members.  Because Foakes was capable of punishing those who fought him, he came to have greater

14   influence because other members were more reluctant to challenge him.

15   **B.    Violence and HASC Rivals**

16   That intra-HASC disputes were addressed with violence is consistent with the fact that violence

17   permeated the enterprise.  The possibility of violence against rival OMGs was ever present to HASC.

18   The most prominent rivals were the Mongols and the Vagos.  HASC members were aware of the history

19   of violence between themselves and these OMGs.  The 2002 riot at Laughlin, although somewhat

20   historical at the time of the events of this case, still had an impact on HASC, both in terms of Foakes'

21   reputation among Hells Angels and in the knowledge that Mongols were significant rivals.

22   The 2008 murder of San Francisco Hells Angels president, Mark Guardado, by a member of the

23   Mongols also had an impact.  Guardado was close with HASC, and his death affected its members and

24   associates.  In addition to mourning the loss of a fellow Hells Angel, the killing put HASC on alert for

25   further attacks by the Mongol or for the need for retaliation.  As an example, just a few days after the

26

27   _____

     [1] The government will not introduce evidence of the Laughlin riot, and counsel have indicated to
28   witnesses that this is a topic we will not be discussing.  However, it is possible that some witnesses will
     cite Laughlin when asked questions.  If they do, questioning from the government will move on without
     seeking further details about that incident.

murder, a number of HASC members and associates were involved in an altercation with an off-duty U.S. Air Marshal in Livermore, CA.  The Marshal was riding his motorcycle when a pack of HASC members and associates came up on him.  He was ordered to yield as HASC exited the highway, and he failed to do so quickly enough.  As a result, a member of the HASC pack kicked the Marshal's motorcycle, causing him to crash.  The HASC pack then pulled into a gas station just off the highway.  Although slightly injured, the Marshal recovered his motorcycle, rode to the gas station, and confronted the pack.  In response, HASC members and associates berated and intimidated the Marshal, forcing him to call 911 for help.  When police arrived, they found the HASC motorcycles loaded with weapons, including knives attached to the frames and three firearms in saddlebags.

Another Mongol-related event was the February 2015 killing of Arizona Hells Angel Patrick Eberhardt.  HASC believed that the Mongols were the suspects, and several HASC members and associates travelled to Arizona for the funeral.  The purpose was to support their fellow Hells Angels and to project a show of force.  The HASC contingent, wearing their Hells Angels gear, drove through Los Angeles, considered to be a Mongol stronghold.  HASC members and associates were armed, and were expected to be armed, because they were travelling through enemy territory and they could be attacked.

The Vagos OMG was another significant rival to HASC.  The rivalry was demonstrated in the beating of a Vago wearing Vago colors in the Konocti casino in June 2011.  Although the government will not be presenting affirmative evidence of this attack, such as through surveillance footage, eyewitnesses, victim testimony, etc., this attack and the criminal prosecution of the HASC members involved was a frequent topic of discussion among HASC members and associates.  The rivalry was also demonstrated by the enterprise's reaction to the murder of a Hells Angel by a Vago in a casino in Reno in September 2011.  Both the Konocti beating and the June 2011 killing placed HASC on high alert regarding possible retaliation by Vagos and the possibility of a broader war between the two OMGs.

HASC insider witnesses will testify that they were expected to attack these rivals "on sight," particularly Mongols.  If an HASC member had the opportunity to attack, he was expected to do so.  This is particularly the case if rivals were seen within HASC territory.  The only caveat would be if such an attack would create problems for HASC, such as by bringing additional law enforcement attention,

1  by sparking a broader war, etc.

2      **C.**    **HASC Violence on Other Motorcycle Clubs and the Public**

3      Witnesses will testify that HASC used violence and the threat of violence to control other

4  motorcycle clubs within HASC territory.  If an organization wanted to present itself as a motorcycle

5  club with the "MC" patch, and wanted to signal a particular territory, they had to ask permission of

6  HASC to do so.  If HASC granted this permission, the club was expected to pay "taxes" or "dues" for

7  the right to display these patches, and they were expected to attend HASC events—which cost money—

8  and to support the enterprise in other ways.  One such club was the "Ghost Warriors," a club founded by

9  HASC member Herb Cody.  Ghost Warriors directly supported HASC, working for HASC in its events,

10  providing security at the HASC clubhouse during HASC internal meetings, and paying regular dues to

11  HASC.  HASC was able to dictate the conduct of Ghost Warriors members, including making decisions

12  on who they could associate with and expelling members.  On one occasion, the Ghost Warriors fell

13  behind in their dues payments.  When HASC discovered this, they summoned the Ghost Warriors to the

14  HASC clubhouse and administered a beating to all the members.

15      HASC used violence to punish those whom it believed showed disrespect, including members of

16  the public.  The February 2008 assault at McNear's bar is just one example.  A patron at the bar was

17  perceived to disrespect a Hells Angel, and he was beaten as a result.  The June 2016 assault of Victim 7

18  was similar and resulted from two issues.  The first arose from Victim 7's sponsorship of an HASC

19  event.  Victim 7 later agreed to sponsor a Ghost Warriors event as well, which angered HASC.  More

20  importantly, however, Victim 7 had gotten to know HASC member Jeremy Greer.  During their

21  relationship, Greer made increasing demands of Victim 7, such as demanding the use of his vehicles.

22  Victim 7 complained about Greer to a Ghost Warrior, who then reported this perceived disrespect to

23  HASC.  HASC members summoned Victim 7 to the HASC clubhouse.  When he arrived, HASC

24  members began beating him, breaking his wrist, among other injuries.  Nelson also took a baseball bat

25  and struck him in the head.

26      The attack on Victim 8 was remarkably similar.  Victim 8 was a member of the Ghost Warriors,

27  and he was a longtime friend of an employee of HASC member Russell Lyles's screen printing

28  business.  In January 2017, Lyles' relationship with that employee soured, and Lyles directed Victim 8

to have no contact with the former employee.  Victim 8 ignored this directive, and in late July 2017, Victim 8 was arrested with this person during a residential burglary.  After his arrest, Victim 8 reported the fact that he disobeyed Lyles' order to Lyles.  Victim 8 was summoned to the HASC clubhouse to address this issue.  After he arrived, Nelson and Lyles attacked him.  During this assault, Nelson took a hammer and struck Victim 8 in the head, using the claw end of the hammer.  While Victim 8 was being beaten, the other Ghost Warriors were summoned to the HASC clubhouse.  Nelson ordered that Victim 8 be expelled from the Ghost Warriors, and Victim 8, injured and bloodied, was walked outside in full view of his former club members.

HASC routinely used violence to punish members and associates who broke club rules.  In addition to the regular practice of using fights to resolve intra-HASC disputes, HASC members would routinely attack prospects and others when their conduct displeased the members.  The most serious violence, however, took place when a member was expelled from the enterprise.  Victim 5 will testify that when he was kicked out for violating the rule that a member may not have sex with another member's old lady, he was subjected to an hours-long beating.  During that beating, he was punched, kicked, hit with a whip, and hit with a baseball bat.  His tattoos were forcibly covered over with a tattoo gun, and Foakes took that gun and crudely etched a line across Victim 5's forehead.  Nelson also took a pistol and struck Victim 5 in the face, fracturing his orbital bone and causing vision problems that persist.  Repeated blows to Victim 5's midsection significantly worsened an abdominal hernia, and those injuries required significant surgeries to correct.

In the same way, when Jeremy Greer was expelled from HASC, he was subject to a violent beating, and he was hospitalized as a result.

The willingness and capability to inflict violence directly correlates to enhanced respect within the enterprise.  HASC members display patches, or "tags," such as the "Filthy Few," that advertise to the world that the particular member has engaged in violence on behalf of the organization.  As discussed above, not only does having the reputation of being skilled at fighting and inflicting violence lead to respect within the organization and fear among the public, it also enhances a member's position because other members will be less likely to challenge that member.

### D.    HASC and Murder

HASC members understand and agree that murder is an act in which the enterprise can engage. The main area in which murder is possible concerns rival OMGs.  HASC members and associates know that violence between themselves and groups such as the Mongols and the Vagos is an ever-present possibility.  They understand that if either group—or another rival OMG—were to attempt to establish a presence within Sonoma County, they would have to address it with violence or the threat of violence. They understand that attacks on their rivals could lead to death—either their own or rival members.

HASC members and associates also understand and agree that they can be subject to being killed by the Hell Angels themselves, such as for violation of enterprise rules.  For instance, members and associates understand that if they were to cooperate with the government or even be suspected of cooperating with the government, they could be killed.  Lesser violations of enterprise rules could lead to a similar fate as well, as happened with HASC member Joel Silva.

### E.    The VICAR Murder of Joel Silva

After he disappeared, HASC members and associates were directed not to discuss Silva. Members and associates knew that Silva had been creating problems for HASC with his drug use, erratic behavior, attacks on non-Hells Angels guests at the clubhouse, and bullying.  However, because he was big and skilled at fighting, he was a difficult person to challenge and correct.  Eventually, Silva began questioning Nelson's leadership and creating problems with other charters.  This came to a head during the June 2014 Laconia Motorcycle Week in Laconia, New Hampshire.

In Laconia, Silva binged drugs and was up for days.  He created problems for many of the Hells Angels he was with, including Brian Wendt and other members from Fresno.  The nadir of the trip, however, came when Silva publicly announced that he was going to kill a Boston/Salem Hells Angel named Sweeney, who was close to Boston/Salem president Christopher Ranieri.  This directly violated the Hells Angel rule that one Hells Angel could not kill another Hells Angel.  With that offense, Ranieri and Wendt decided that Silva had to be killed.

Wendt and the Fresno Hells Angels returned to California, and soon after they arrived, they met with Nelson to address the issue.  Nelson agreed that Silva needed to be dealt with.  Because he was so outspoken and had so many non-Hells Angels connections in Sonoma County, it would be a problem for

Silva to simply be expelled.  It was better if he just disappeared, and Nelson agreed that this should happen.

When Silva returned from Laconia, he realized that he was in trouble with the Hells Angels, and he was on edge.  Silva expressed to several people, including his family, that he was in some kind of trouble with HASC and that he did not know how it was going to work out.  He suggested that it was possible that he could disappear, and that if he did, HASC would claim he was on the run.  He told people not to believe this story.  To address Silva's unease, the plan was for Russell Ott to take Silva to Fresno, because Silva trusted Ott.  Silva was told that he would travel to Fresno to address his problems with Brian Wendt; the two would likely fight; and afterward, the issue would be resolved.  Ott was a long-tenured, respected member, he and Silva lived right near each other, and Ott was close with him and his family.

On July 14, 2014—the day before Silva went missing—Wendt was in Massachusetts in the vicinity of Ranieri's residence, and Wendt, Nelson, and Ranieri were in regular phone contact.  Wendt returned to California that evening.  Also on July 14, 2014, Ott and Silva were in regular contact through text, and Ott and Nelson shared calls.  In addition, Fresno member Merl Hefferman began calling a person at a crematorium in Fresno.

Throughout the morning of July 15, 2014, Wendt, Nelson, and Ranieri exchanged a number of text messages and phone calls.  Wendt also was calling and texting Hefferman and another Fresno member, Robbie Huff.  Meanwhile, Silva was communicating with both Ott and Nelson, and Nelson was in touch with Ott.  At around 11:30 am, Silva and Wendt talked on the phone, and shortly after that, Silva and Ott began heading to Fresno.  Wendt and Ranieri then continued calling each other, and Wendt, Huff, and Hefferman were in contact as well.

Shortly after 4:00 pm, Silva and Ott arrived in the Fresno area.  They travelled to the Fresno clubhouse, and there, Silva made his last call, at 4:36 pm, to Brian Wendt.  Silva later met with Wendt inside the clubhouse.  Wendt told Silva that he had some marijuana for Silva to sell, and that it was underneath the stage.  When Silva went over to the stage to examine it and bent down, Wendt shot him in the back of the head.  He later bragged about how he had done this.

The next morning, Hefferman called a worker at a local crematory. Hefferman had been attempting to make inroads at this facility and the funeral home with which it was associated, befriending the staff and asking for the keys to the crematory. He had not yet been successful, but on the morning of July 16, 2014, he called the worker and threatened him, indicating that he was going to use the facility no matter what.

That morning, the worker began the process of incinerating the first body of the day. He left the facility to get a drink at a nearby convenience store, and when he returned, he saw two young men and a hatchback car pulled up to the doors of the crematory. When he confronted them, one of the men lifted up his shirt to display a firearm in his waistband. The worker then backed off. (This person was later identified as Jerald Williams, Hefferman's stepson.) After 5-10 minutes, the men drove off. The worker then went to the incinerator, and he saw that there was a second body inside. It was already on fire, so he could not remove it, so he increased the time for the oven. When the process was over, he carefully separated the ashes from the two bodies—to preserve their dignity—and processed the two sets of remains. He held on to the ashes from the second body for a time, and then spread them in a nearby cemetery, which is the process for individuals who have no one to claim them.

Later on July 16, 2014, Hefferman called the worker and threatened him again, to ensure that he not report what happened to law enforcement.

### F.    HASC Witness Intimidation

The HASC rule of "No Snitches" is a key value. A person cannot become a Hells Angel if he has ever cooperated with law enforcement. HASC conducts background checks and reviews prospective members' criminal histories looking for any indication that a person has ever testified on behalf of the government or received sentencing consideration. They look for sealed records, discrepancies between charges and sentencing, and other signals that the person obtained any benefits from a prosecutor's office. The value of "no snitches" is seen in imagery possessed by members and in threats made by them. Former HASC associates will testify that they have been told that the Hells Angels are a worldwide organization, and that if the person ever went to the police, they would disappear, and their entire family would be harmed. They will discuss the expectation that if they had the opportunity to influence a witness against a member who was facing charges, they would make efforts to ensure that

1  the witness did not testify.

2      Several witnesses will testify that the defendants have threatened their lives and the lives of their

3  families should they go to the police about HASC activity, including attacks on them.  HASC created a

4  reputation that a significant number of the non-law enforcement witnesses feel considerable anxiety

5  about testifying.  They have genuine concern about reprisals by Hells Angels members or those who

6  wish to make a name for themselves with the Hells Angels—not just during the course of this case, but

7  for years in the future.

8      ### G.    HASC and Extortion

9      The entire membership structure of HASC is directly connected to extortion.  When a prospect or

10  a full patch member is removed from the enterprise, he has to surrender his motorcycle.  These are

11  expensive, American-made Harley Davidson motorcycles, costing up to $25,000 or more.  Even older

12  models are worth a considerable amount of money.  For instance, when former prospect S.V. was forced

13  to step down from prospecting, he was offered a choice—sign over the title to his motorcycle (which

14  was not working at the time) or pay $10,000.  He surrendered the title.  At least one HASC insider will

15  testify that this was viewed as a source of revenue.

16      HASC defends this practice by claiming that prospects and members agree to forfeit their

17  motorcycles because they sign a contract converting them to Hells Angels property, and they agree to

18  surrender all Hells Angels property to the enterprise should they leave it.  For members, the

19  "conversion" to Hells Angels property is manifest by placing the death's head logo and the Hells Angels

20  name on the vehicles, but prospects are not allowed to use that name or that symbol.  However, the fact

21  that this is simply extortion is manifest in two ways.  First, former members and prospects know that if

22  they refuse to surrender their motorcycles, HASC will not sue them under the supposed contract; they

23  will beat them or worse.  Second, when a member or prospect is kicked out, HASC members go to that

24  person's residence to reclaim all property, clothing, jewelry, and any indica bearing the Hells Angels

25  name or logos.  When they do so, however, they can also take any items of value they see, knowing that

26  the former member or prospect will not protest or go to police.  This can be seen in the video

27  surveillance from Victim 5's residence the night he was beaten out.  In that footage, HASC members

28  can be seen coming to the residence and leaving with material.  Defendant Lyles can also be seen

1  attempting to steal Victim 5's car, which had no connection to HASC.  He was unsuccessful, however,

2  because the battery was dead.

3       **H.**    **HASC and Drug Trafficking and Robbery**

4       There will be considerable evidence regarding HASC and drug trafficking.  Among this evidence

5  There will be evidence of concerted actions among HASC members and associates to grow and to

6  possess marijuana with intent to distribute.  Several HASC members have convictions related to

7  controlled substance offenses, and there are at least two robberies involving drugs and drug proceeds.

8  The second robbery also featured an attempted kidnapping, where Defendant Jeremy Greer followed the

9  victim from his home, to his daughter's school, where the victim dropped her off, and then for miles to

10  the town of Santa Rosa, where police intervened.

11  **IV.**    **APPLICABLE STATUTES**[2]

12       **A.**    **18 U.S.C. § 1962 (d) (RICO Conspiracy) (Count 1)**

13            **1.**    **Statutory Language**

14  Title 18, United States Code, Section 1962(c) provides, in pertinent part:

15      It shall be unlawful for any person employed by or associated with any enterprise

16      engaged in, or the activities of which affect, interstate or foreign commerce, to conduct, or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

17

18  Title 18, United States Code, Section 1962(d) provides in pertinent part: "It shall be unlawful for any

19  person to conspire to violate any of the provisions of subsection . . . (c)."

20            **2.**    **Applicable Law**

21                **(i)**    **RICO Conspiracy**

22       First, to convict a defendant of RICO conspiracy, the government is not required to prove that

23  the alleged enterprise was actually established, that the defendant was actually associated with the

24  enterprise, or that the enterprise or its activities actually affected interstate commerce.  Instead, because

25  the agreement to commit a RICO offense is the essence of a RICO conspiracy offense, the government

26  need only prove that if the conspiracy offense were completed as contemplated, the enterprise would be

27

28      [2] The applicable statutes and elements will be more fully addressed in the parties proposed jury instructions.

1   established, the defendant would be associated with the enterprise, and the enterprise or its activities

2   would affect interstate commerce.  *Salinas v. United States*, 552 U.S. 52, 65 (1997).

3          Second, to convict a defendant of RICO conspiracy, the government need not prove that

4   individual enterprise members personally had agreed to commit two racketeering acts or had

5   participated in the commission of the actual crimes.  *Salinas*, 552 U.S. at 63 (upholding the sufficiency

6   of a RICO conspiracy conviction of a sheriff's deputy who facilitated scheme whereby his boss received

7   multiple kickbacks from a prisoner in exchange for permitting unauthorized conjugal visits).  The

8   government must only prove that the particular defendant agreed that, at some point during the life of

9   the conspiracy, a member of the conspiracy would commit, on behalf of the conspiracy, at least two

10  related acts of racketeering, with the jury being unanimous as to which type or types of predicate

11  racketeering activity the defendant agreed would be committed.  *Id.* at 65.  As the *Salinas* Court stated:

12         A conspirator must intend to further an endeavor which, if completed, would satisfy all
           the elements of a substantive criminal offense, but it suffices that he adopt the goal of
13         furthering or facilitating the criminal endeavor. He may do so in any number of ways
           short of agreeing to undertake all of the acts necessary for the crimes completion . . .

14
           A (RICO or other federal) conspiracy may exist even if a conspirator does not agree to
15         commit or facilitate each and every part of the substantive offense. The partners in the
           criminal plan must agree to pursue the same criminal objective (here the operation of the
16         RICO enterprise) and may divide up the work, yet each is responsible for the acts of
           each other. *See Pinkerton v. United States*, 328 U.S. 640 (1946). If conspirators have a
17         plan which calls for some conspirators to perpetrate the crime and others to provide
           support, the supporters are as guilty as the perpetrators.
18

19  522 U.S. at 62-65.

20         Third, to convict a defendant of a substantive RICO offense, the government must prove that the

21  defendant personally participated in the operation or management of the enterprise.  Such proof,

22  however, is not required to convict a defendant of a RICO conspiracy offense.  Rather, a defendant may

23  be convicted of a RICO conspiracy offense provided that the defendant knowingly agreed to facilitate a

24  scheme which, if completed, would constitute a RICO violation involving at least one conspirator who

25  would participate in the operation or management of the enterprise.  *United States v. Fernandez*, 388

26  F.3d 1199, 1230 (9th Cir. 2004) (holding that *Salinas* rendered the Ninth Circuit's prior decisions

27  requiring that a defendant "conspired to operate or manage the enterprise herself" invalid, and instead

28  holding that "a defendant is guilty of conspiracy to violate 1962(c) if the evidence showed that she

1  knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO

2  enterprise") (internal quotations omitted).

3       Under *Salinas* and its progeny, the government may prove the defendant entered a conspiratorial

4  agreement to violate RICO in two alternative ways: (1) the government may prove that the defendant

5  agreed to commit two overt acts in furtherance of the enterprise or (2) it may prove that the defendant

6  agreed to participate in the conduct of the enterprise with the knowledge and intent that other members

7  of the conspiracy would commit at least two overt acts in furtherance of the enterprise.  *See United*

8  *States v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001).

9       RICO conspiracy also differs materially from the general conspiracy statute set forth in 18

10  U.S.C. § 371.  Specifically, while RICO conspiracy incorporates the general law of conspiracy,[3] *Salinas*,

11  552 U.S. at 63-65, Congress designed the statute to be broader in scope than a Section 371 conspiracy.

12  As the Fifth Circuit explained:

13      We are convinced that through RICO, Congress intended to authorize the single
    prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate

14      "wheel" and "chain" rationales with a new statutory concept; the enterprise.

15      . . . RICO helps to eliminate this problem (diverse crimes by apparently unrelated
    individuals) by creating a substantive offense which ties together these diverse parties

16      and crimes. . . The gravamen of the conspiracy charge in this case is not that each
    defendant agreed to commit (a specific crime), it is that each agreed to participate,

17      directly and indirectly, in the affairs of the enterprise . . . .

18  *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978).  For example, unlike a Section 371

19  conspiracy, the government need not establish that any overt acts were committed.  *Salinas*, 522 U.S. at

20  63; *United States v. Smith*, 413 F.3d 1253, 1265 (10th Cir. 2005); *United States v. Corrado*, 286 F.3d

21  934, 937 (6th Cir. 2002); *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991); *United States v.*

22  *Gonzalez*, 921 F.2d 1530, 1547-48 (11th Cir. 1991); *United States v. Torres Lopez*, 851 F.2d 520, 525

23  (1st Cir. 1988); *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987).  The RICO conspiracy

24  provision, then, is even more comprehensive than the general conspiracy offense in 18 U.S.C. § 371.

25

26      [3] As with proof of any other type of conspiracy, the agreement need not be stated or written, but
may be inferred from circumstantial evidence or the defendant's acts pursuant to the scheme. *United*

27  *States v. Diecidue*, 603 F.2d 535 (5th Cir. 1979); *Glasser v. United States*, 315 U.S. 60, 80 (1942). In
addition, there is no requirement that the defendant in a RICO conspiracy know the full scope of the

28  conspiracy or even the identity of all the conspirators. *United States v. Castro*, 89 F.3d 1443, 1451 (11th
Cir. 1997); *United States v. Sutherland*, 656 F.2d 1181, 1190 (5th Cir. 1981).

1    *Salinas*, 522 U.S. at 63.

2                    **(ii)    Enterprise**

3          As defined by the RICO statute, the term "enterprise" includes "any individual, partnership,

4    corporation, association, or other legal entity, and any union or group of individuals associated-in-fact."

5    18 U.S.C. § 1961(4); *see Microsoft v. Odom*, 486 F.3d 541, 548 (9th Cir. 2007) (a single individual or

6    legal entity can qualify as an enterprise).  To prove the existence of an associate-in-fact enterprise, such

7    as the one charged in the Indictment, the government must establish the existence of an ongoing

8    organization, whether it be formally or informally organized, acting with a common purpose and acting

9    as a continuing unit.  *Id.* at 548, 552.[4]  To be acting as a continuing unit, it is not necessary that every

10   member be involved in each of the acts of racketeering, that the predicate acts be interrelated in any

11   way, that the membership in the organization remain constant over time, or that there be any

12   ascertainable structure to the organization.  *Id.* at 551-52.  Instead, the focus is on whether the

13   associates' behavior consists of ongoing, as opposed to isolated, activity.  *United States v. Turkette*, 452

14   U.S. 576, 583 (1981); *Odom*, 486 F.3d at 545-52.

15         In *United States v. Boyle*, 556 U.S. 938, 946 (2009), the Supreme Court held that an association-

16   in-fact enterprise must have a structure and must have "at least three structural features: a purpose,

17   relationships among those associated with the enterprise, and longevity sufficient to permit these

18   associates to pursue the enterprise's purpose."  The Court further held that the existence of an enterprise

19   is a distinct element "beyond that inherent in the pattern of racketeering activity."  *Id.* at 947.  The Court

20   stressed, however, that although the pattern does not necessarily establish the enterprise, this does not

21

22         _____

23         [4] Establishing that the members of the enterprise operated together in a coordinated manner in
     furtherance of a common purpose may be proven by a wide variety of direct and circumstantial
     evidence; including, but not limited to, inferences from the members' commission of similar
24   racketeering acts in furtherance of a shared objective, financial ties, coordination of activities,
     community of interests and objectives, interlocking nature of the schemes, and overlapping nature of the
25   wrongful conduct.  *See e.g. United States v. Owens*, 167 F.3d 739, 751 (1st Cir. 1999) (members of drug
     trafficking enterprise provided other members with financial assistance and coordinated transportation
26   of drugs); *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999) ("Additional evidence of [the
     enterprise's] organization and continuity comes from the robberies' consistent pattern"); *United States v.
27   Davidson*, 122 F.3d 531, 535 (8th Cir. 1997) ("The length of these associations, the number and variety
     of crimes the group jointly committed, and Davidson's financial support of his underlings demonstrates
28   an ongoing association with a common purpose to reap the economic rewards flowing from the crimes,
     rather than a series of ad hoc relationships").

mean that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Id.* The Court reiterated its holding in *Turkette* that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.* The Court added:

> Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods - by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Id.* at 948.

### (iii)      Employed by or Associated with the Enterprise

A person is "employed by" an enterprise when, for example, the person is on the payroll of the enterprise and performs services for the enterprise, holds a position in the enterprise, or has an ownership interest in the enterprise. *See, e.g.*, *United States v. Gabriele*, 63 F.3d 61, 68 (1st Cir. 1995). A person is "associated with" the enterprise if the person joins with other members of the enterprise and knowingly aids or furthers the activities of the enterprise, or conducts business with or through the enterprise. *See. e.g.*, *United States v. Marino*, 277 F.3d 11, 27-29 (1st Cir. 2002); *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005).

### (iv)      Conducted or Participated in the Affairs of the Enterprise

A particular defendant participates, directly or indirectly, in the conduct of the enterprise's affairs by participating in the operation or management of the enterprise by having some part in directing the enterprise's affairs. For a defendant to participate in the operation or management of the enterprise, the defendant need not exercise significant control over, or within, the enterprise. Similarly, the defendant need not have had either a formal position in the enterprise or have had primary responsibility for the enterprise's affairs as "[a]n enterprise is 'operated' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management" or who carry out upper management's orders. *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993); *see*

1   *also Fernandez*, 388 F.3d at 1228.  Therefore, "all who participate in the conduct of [the] enterprise,

2   whether they are generals or foot soldiers," can be held legally responsible under the RICO statute.

3   *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994).

4                    **(v)      Pattern of Racketeering Activity**

5          The RICO statute defines a "pattern of racketeering activity" as at least two racketeering acts

6   within ten years of one another.  18 U.S.C. § 1961(5).  In order to form a pattern, the two acts must be

7   related to each other and pose a threat of continuing activity.  *H.J. Inc. v. Northwestern Bell Telephone

8   Co.*, 492 U.S. 229, 238-40 (1989); *Fernandez*, 388 F.3d at 1221.  In some cases, "the threat of continuity

9   may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular

10  way of doing business.  Thus, the threat of continuity is sufficiently established where the predicates can

11  be attributed to a defendant operating as part of a long-term association that exists for criminal

12  purposes."  *H.J. Inc.,* 492 U.S. at 241-243.  To establish that the affairs of the enterprise were conducted

13  through a pattern of racketeering activity, evidence must exist that "the predicate offenses are related to

14  the activities of th[e] enterprise."  *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir. 1980). The requisite

15  relationship between the racketeering acts and the enterprise would be established when the racketeering

16  acts "have the same or similar purposes, results, participants, victims, or methods of commission, or

17  otherwise are interrelated by distinguishing characteristics and are not isolated events . . ." *Id.* at 240.

18                    **(vi)     Effect on Interstate Commerce**

19         The Ninth Circuit repeatedly has held that only a "de minimis" effect on interstate commerce is

20  required for a RICO violation.  *Fernandez*, 388 F.3d at 1218; *see also United States v. Bagnariol*, 665

21  F.2d 877, 892 (9th Cir. 1981).  Moreover, it is the activities of the enterprise, not each predicate act,

22  which must affect interstate commerce.  *Bagnariol*, 665 F.2d at 892.

23                    **(i)      Evidence of Uncharged Crimes is Admissible**

24         It is well established that in RICO cases, evidence of uncharged crimes is admissible to prove the

25  existence of the enterprise, a RICO conspiracy, a defendant's participation in both, continuity of the

26  pattern of racketeering activity, and other related matters.  *See, e.g*., *United States v. Matera*, 489 F.3d

27  115, 120-21 (2d Cir. 2007) (admission of uncharged murders committed by members of the Gambino

28

1    LCN family to prove the RICO enterprise—the Gambino LCN family).[5]

2         **B.      18 U.S.C. § 1959(a) (Violent Crime in Aid of Racketeering) (Counts 2, 3, and 6)**

3

4    _____

     [5] *See also United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003) (admitting evidence of
5    sixteen uncharged robberies to establish the alleged enterprise and conspiracy); *United States v. Diaz*,
     176 F.3d 52, 79 (2d Cir. 1999) (admission of evidence that members of the Latin Kings Street gang, the
6    RICO enterprise, committed uncharged drug trafficking and crimes of violence on behalf of the Latin
     Kings "to prove the existence, organization and nature of the RICO enterprise, and a pattern of
7    racketeering by each defendant-appellant"); *United States v. Richardson*, 167 F.3d 621, 625-26 (D.C.
     Cir. 1999) (continuity may be established by the totality of all the co-defendants' unlawful conduct);
8    *United States v. Keltner*, 147 F.3d 662, 667-68 (8th Cir. 1998) (uncharged criminal conduct by
     coconspirator admissible to prove the enterprise); *United States v. Salerno*, 108 F.3d 730, 738-39 (7th
9    Cir. 1997) (uncharged extortionate collections by defendants admissible to prove the enterprise); *United
     States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (admission of evidence of uncharged murders
10   committed by some defendants and other enterprise members to show the existence of the enterprise and
     acts in furtherance of the conspiracy); *United States v. Krout*, 66 F.3d 1420, 1425 (5th Cir. 1995)
11   (admission of uncharged murders committed by the defendants was not prejudicial when admitted to
     establish that murder and extreme violence were part of the enterprise's objectives and manner and
12   means), cert. denied, 516 U.S. 1136 (1996); *United States v. Disalvo*, 34 F.3d 1204, 1221 (3d Cir. 1994)
     (upholding admission of defendant's uncharged acts to establish the existence of the enterprise and the
13   defendant's participation in and knowledge of the enterprise); *United States v. Thai*, 29 F.3d 785, 812-13
     (2d Cir. 1994) (admission of uncharged extortion, robbery and murder plans by defendants to prove the
14   RICO conspiracy and acts in furtherance of it); *United States v. Brady*, 26 F.3d 282, 286-88 (2d Cir.
     1994) (admission of uncharged murders committed by nondefendant members of the Colombo LCN
15   family to prove the Colombo family enterprise and the charged conspiracy by a faction of the Colombo
     family to kill members of a rival faction); *United States v. Clemente*, 22 F.3d 477, 483 (2d Cir. 1994)
16   (upholding admission of defendant's uncharged acts for purpose of establishing existence of RICO
     enterprise), cert. denied, 513 U.S. 900 (1994); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir.
17   1991) (admission of evidence of murders by enterprise members occurring prior to the defendant's
     joining the enterprise was proper to show the existence of the enterprise), cert. denied, 503 U.S. 941
18   (1992); *United States v. Eufrasio*, 935 F.2d 553, 572-73 (3d Cir. 1991) (upholding admission of
     uncharged murders and other mafia crimes to show the existence and nature of the RICO enterprise and
19   conspiracy), cert. denied, 502 U.S. 925 (1991); *United States v. Alkins*, 925 F.2d 541, 551-53 (2d Cir.
     1991) (the requisite continuity may be established against a defendant through evidence of uncharged
20   crimes by other members of the enterprise not charged in the indictment); *United States v. Coiro*, 922
     F.2d 1008, 1017 (2d Cir. 1991) (continuity established where a corrupt attorney's bribery of public
21   officials and money laundering spanning approximately four months was part of a long-term drug
     enterprise that engaged in other unlawful activities that was likely to continue "absent outside
22   intervention"); *United States v. Gonzalez*, 921 F.2d 1530, 1545-47 (11th Cir. 1991) (uncharged crimes
     by defendant and other conspirators admissible to prove the enterprise and continuity); *United States v.
23   Link*, 921 F.2d 1523, 1527 (11th Cir. 1991) (evidence of continuity was not limited to the defendant's
     two acts of possession of drugs with the intent to distribute, but rather was adequately established by
24   evidence of other unlawful drug trafficking by other members of the enterprise); *United States v.
     Ellison*, 793 F.2d 942, 949 (8th Cir. 1986) (uncharged crimes of violence by other members of the
25   enterprise admitted to establish existence of enterprise), cert. denied, 479 U.S. 937 (1986); *United States
     v. Murphy*, 768 F.2d 1518, 1534-35 (7th Cir. 1985) (proper to admit evidence of uncharged bribes paid
26   to defendant to prove overt acts in furtherance of the conspiracy and to prove a common plan and
     absence of mistake to rebut defendant's character evidence), cert. denied, 475 U.S. 1012 (1986); *United
27   States v. Gray*, 292 F. Supp. 2d 71, 77-82 (D.D.C. 2003) (holding that evidence of various crimes of
     violence, drug trafficking, and money laundering properly were admitted to prove the charged RICO and
28   drug trafficking conspiracies, the continuing of the pattern of criminal activity and the association of
     members of the conspiracies and enterprise).

### 1.        Statutory Language

Title 18, United States Code, Section 1959(a) provides in pertinent part:  "Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . ."

## C.        18 U.S.C.  § 2 (Aiding and Abetting)

### 1.        Statutory Language

Title 18, United States Code, Section 2, provides, in pertinent part: "[W]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

### 2.        Applicable Law

It is not a prerequisite to conviction for aiding and abetting that the principal be convicted, indicted, or even identified, although the government must prove that someone committed the underlying crime.  *See United States v. Mann*, 811 F.2d 495, 497 (9th Cir. 1987); *United States v. Barnett*, 667 F.2d at 835, 841 (9th Cir. 1982).  Instead, in order to establish a defendant's guilt as an aider and abettor, the government must prove that the defendant knowingly associated himself with a criminal venture and by his participation in that venture sought to make it succeed.  *See United States v. Vaccaro*, 816 F.2d 443, 455 (9th Cir. 1987); *United States v. Vaughn*, 797 F.2d 1485, 1492 (9th Cir. 1986); *United States v. McKoy*, 771 F.2d 1207, 1215 (9th Cir. 1985).  Conscious assistance in the planning of a crime is a sufficient basis for aider and abettor liability.  *See McKoy*, 771 F.2d at 1216; *Barnett*, 667 F.2d at 841-842.  With respect to aiding and abetting a crime involving the use of a firearm in furtherance of a crime of violence, the Supreme Court made clear that:

> [T]he Government makes its case by proving that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission.

*Rosemond v. United States*, 572 U.S. 65, 67 (2014).

D.     **Conspiracies**

1.     **The Agreement**

 "The agreement need not be explicit; it may be inferred from the defendant's acts pursuant to a fraudulent scheme or from other circumstantial evidence." *United States v. Cloud*, 872 F.2d 846, 852 (9th Cir. 1989); *see also United States v. Boone*, 951 F.2d 1526, 1543 (9th Cir. 1991); *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir. 1989).  The government need not prove direct contact between coconspirators or the existence of a formal agreement; instead, an agreement constituting a conspiracy may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose.  *United States v. Garza*, 980 F.2d 546, 552-53 (9th Cir. 1992); *United States v. Hegwood*, 977 F.2d 492 (9th Cir. 1992); *United States v. Becker*, 720 F.2d 1033, 1035 (9th Cir. 1983).

It is not necessary for the government to show that the defendant knew "the exact scope of the conspiracy, the identity and role of each of the co-conspirators, or the details of the operations of any particular plan." *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978).  However, the government must prove that the defendant was aware of "the essential nature of the plan." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947).  *See also United States v. Krasovich*, 819 F.2d 253, 255-56 (9th Cir. 1987).  The key element of proof as to any specific co-conspirator is the showing that he knew, or had reason to know, of the participation of others in the illegal plan, and that he knew, or had reason to know, that the benefits to be derived from the operation were probably dependent upon the success of the entire venture.  *United States v. Abushi*, 682 F.2d 1289, 1293 (9th Cir. 1982); *United States v. Baxter*, 492 F.2d 150, 158 (9th Cir. 1973).

2.     **Participation in the Conspiracy**

The government must show that a conspiracy between at least two people existed and that the defendant was a member of the conspiracy charged.  *United States v. Reese*, 775 F.2d 1066, 1071 (9th Cir. 1985) (conspiracy must involve at least two people); *United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir. 1985) (charged defendant must be member of conspiracy).  Once a conspiracy is proven, evidence establishing beyond a reasonable doubt the defendant's connection to that conspiracy—even if the connection is slight—is sufficient to convict him of knowingly participating in the conspiracy.

1   *United States v. Hubbard*, 96 F.3d 1223, 1227 (9th Cir. 1996); *United States v. Stauffer*, 922 F.2d 508,

2   514-15 (9th Cir. 1990); *United States v. Guzman*, 849 F.2d 447, 448 (9th Cir. 1988).

3      **3.**  **Liability for Co-Conspirator Acts**

4      It is a well settled tenet of conspiracy law, known as *Pinkerton* liability, that "a party to an

5   unlawful conspiracy may be held responsible for substantive offenses committed by his coconspirators

6   in furtherance of the unlawful project, even if the party himself did not participate directly in the

7   commission of the substantive offense." *United States v. Vasquez*, 858 F.2d 1387, 1393 (9th Cir. 1988).

8   *See also Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *United States v. Olano*, 62 F.3d 1180,

9   1199 (9th Cir. 1995). For *Pinkerton* liability to apply, it is necessary that the substantive offense was

10  within the scope of the unlawful agreement, was committed in furtherance of the conspiracy, and was

11  reasonably foreseeable as a natural consequence of the unlawful confederation. *Pinkerton*, 328 U.S. at

12  647-48; *see also United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986) ("A co-conspirator is

13  responsible for any act done in furtherance of the conspiracy unless it could not reasonably be foreseen

14  as a natural consequence of the agreement"); *United States v. Reed*, 726 F.2d 570, 580 (9th Cir. 1984)

15  ("The law is clear that a defendant may be convicted of the substantive acts of his co-conspirators, as

16  long as those acts are committed pursuant to and in furtherance of the conspiracy.").

17     A conspirator who joins a pre-existing conspiracy is bound by all that has gone on before in the

18  conspiracy. *See United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993) ("One may join a

19  conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy,

20  even if unknown to him"); *see also United States v. Bibero*, 749 F.2d 586, 588 (9th Cir. 1984); *United*

21  *States v. Saavedra*, 684 F.2d 1293, 1301 (9th Cir. 1982).

22     **4.**  **Proof of Conspiracy**

23     The order of proof in a conspiracy case is a matter committed to the sound discretion of the trial

24  judge. *See United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir. 1982). "The government does not

25  have to present *direct* evidence. Circumstantial evidence and the inferences drawn from that evidence

26  will sustain a conspiracy conviction." *United States v. Castro*, 972 F.2d 1107, 1110 (9th Cir. 1992)

27  (emphasis in original). When a defendant is charged with conspiracy, evidence tending to show the

28  existence of a conspiracy is admissible even though such evidence does not implicate the defendant, as

1  the defendant's conviction is conditioned upon proof of the conspiracy.  *United States v. Vega-Limon*,

2  548 F.2d 1390, 1391 (9th Cir. 1977).  A conspiracy is presumed to continue unless there is affirmative

3  evidence that the defendant abandoned, withdrew from, or disavowed the conspiracy or defeated its

4  purpose.  *United States v. Jimenez Recio*, 537 U.S. 270, 277 (2003); *United States v. Krasn*, 614 F.2d

5  1229, 1236 (9th Cir. 1980).

### 5. Co-conspirator Declarations

7  　　　Declarations by one co-conspirator during the course of and in furtherance of the conspiracy may

8  be used against another conspirator because such declarations are not hearsay.  *See* Fed. R. Evid.

9  801(d)(2)(E).  Further, statements made in furtherance of a conspiracy were expressly held by the

10  Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 56 (2004), to be "not testimonial" such that

11  their admission does not violate the Confrontation Clause.  As such, the admission of co-conspirator

12  statements pursuant to Fed. R. Evid. 801(d)(2)(E) requires only a foundation that: (1) the declaration

13  was made during the life of the conspiracy; (2) it was made in furtherance of the conspiracy; and (3)

14  there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the

15  conspiracy and of the defendant's connection to it.  *See Bourjaily v. United States*, 483 U.S. 171, 173,

16  181 (1987).

17  　　　The government must prove by a preponderance of the evidence that a statement is a co-

18  conspirator declaration in order for the statement to be admissible under Rule 801(d)(2)(E).  *Bourjaily*,

19  483 U.S. at 176; *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987).  Whether the

20  government has met its burden is to be determined by the trial judge, and not the jury.  *United States v.*

21  *Zavala-Serra*, 853 F.2d 1512, 1514 (9th Cir. 1988).

22  　　　The trial court has discretion to determine whether the government may introduce co-conspirator

23  declarations before establishing the conspiracy and the defendant's connection to it.  *United States v.*

24  *Loya*, 807 F.2d 1483, 1490 (9th Cir. 1987).  It also has the discretion to vary the order of proof in

25  admitting a co-conspirator's statement.  *Id.*  The court may allow the government to introduce co-

26  conspirator declarations before laying the required foundation under the condition that the declarations

27  will be stricken if the government fails to ultimately establish by independent evidence that the

28  defendant was connected to the conspiracy.  *Id.*; *United States v. Spawr Optical Research, Inc.*, 685 F.2d

1076, 1083 (9th Cir. 1982); *Fleishman*, 684 F.2d at 1338.

It is not necessary for the defendant to be present at the time a co-conspirator statement was made for it to be introduced as evidence against that defendant. *Sendejas v. United States*, 428 F.2d 1040, 1045 (9th Cir. 1970). Similarly, declarations of an unindicted co-conspirator made in furtherance of the conspiracy may be used against a charged conspirator. *United States v. Nixon*, 418 U.S. 683, 701 (1974); *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993).

To be admissible under Fed. R. Evid. 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy, a statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]." *United States v. Arambula-Ruiz*, 987 F.2d 599, 607-08 (9th Cir. 1993); *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988). Such statements are admissible whether or not they actually result in any benefit to the conspiracy. *Williams*, 989 F.2d at 1068; *United States v. Schmit*, 881 F.2d 608, 612 (9th Cir. 1989). Thus, co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E) and can be made to government informants and undercover agents. *Zavala-Serra*, 853 F.2d at 1516 (statements to informants and undercover agents); *United States v. Tille*, 729 F.2d 615, 620 (9th Cir. 1984) (statements to informants); *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover agent).

Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy":

1. Statements made to induce enlistment in the conspiracy (*United States v. Arias-Villanueva*, 998 F.2d 1491, 1502 (9th Cir. 1993));

2. Statements made to keep a conspirator abreast of a co-conspirator's activity, to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator (*Arias-Villanueva*, 998 F.2d at 1502);

3. Statements made to prompt action in furtherance of the conspiracy by either of the participants to the conversation (*United States v. Layton*, 720 F.2d 548, 556 (9th Cir. 1983));

4. Statements related to the concealment of the criminal enterprise (*Tille*, 729 F.2d at 620); *Garlington v. O'Leary*, 879 F.2d 277, 283 (7th Cir. 1989));

5. Statements seeking to control damage to an ongoing conspiracy (*Garlington*, 879 F.2d at 283);

6. Statements made to reassure members of the conspiracy's continued existence (*United*

*States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988));

7. Statements by a person involved in the conspiracy to induce a buyer's purchase of contraband by assuring the buyer of the person's ability to consummate the transaction (*Echeverry*, 759 F.2d at 1457);

8. Statements identifying another co-conspirator as source for the contraband to be sold to purchaser (*United States v. Lechuga*, 888 F.2d 1472, 1480 (5th Cir. 1989));

9. "Puffing", boasts and other conversation designed to obtain the confidence of another conspirator (or apparent conspirator who actually was an undercover agent) (*United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988); *Lechuga*, 888 F.2d at 1480; *United States v. Miller*, 664 F.2d 94, 98 (5th Cir. 1981)); and

10. Statements that refer to another conspirator as the boss, the overseer, or sir (*United States v. Barnes*, 604 F.2d 121, 157 (2d Cir. 1979)).

## V.    EVIDENTIARY ISSUES

### A.    Admissibility of Physical Evidence

#### 1.    Authentication and Identification/ Chain of Custody

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  As such, issues of authenticity and identification are treated under Rule 901 as simply "a special aspect of relevancy."  Fed. R. Evid. 901(a) (Advisory Committee Notes).

Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification."  *United States v. Chu Kong Yin,* 935 F.2d 990, 996 (9th Cir. 1991); *see also United States v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir. 1989); *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985).  Once the government meets this burden, "the credibility or probative force of the evidence offered is, ultimately, an issue for the jury." *Black*, 767 F.2d at 1342.

The authenticity of proposed exhibits may be proven by circumstantial evidence.  *United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir. 1975); *United States v. King*, 472 F.2d 1, 9-11 (9th Cir. 1973).  Moreover, the prosecution need only prove a rational basis from which the jury may conclude that the exhibits did, in fact, belong to the defendant.  Federal Rule of Evidence 401(a); *United States v. Blackwell*, 694 F.2d 1325, 1330 (D.C. Cir. 1982); *United States v. Sutton*, 426 F.2d 1202 (D.C. Cir.

1969).

To be admitted into evidence, a physical exhibit must be in substantially the same condition as when the crime was committed. The court may admit the evidence if there is "a reasonable probability the article has not been changed in important respects." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991). This determination is to be made by the trial judge and will not be overturned except for clear abuse of discretion. Factors the court may consider in making this determination include the nature of the item, the circumstances surrounding its preservation, and the likelihood of intermeddlers having tampered with it. *See United States v. Kaiser*, 660 F.2d 724, 733 (9th Cir. 1981); *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960).

In establishing chain of custody as to an item of physical evidence, the government is not required to call all persons who may have come into contact with the piece of evidence. *Reyes v. United States*, 383 F.2d 734 (9th Cir. 1967); *Gallego*, 276 F.2d at 917. Moreover, a presumption of regularity exists in the handling of exhibits by public officials. *Kaiser*, 660 F.2d at 733; *United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc); *Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991).

Therefore, to the extent that alleged or actual gaps in the chain of custody exist, such gaps go to the weight of the evidence rather than to its admissibility. *Gallego*, 276 F.2d at 917.

### 2.      Photographs

Photographs may be authenticated by a witness who "identif[ies] the scene itself [in the photograph] and its coordinates in time and place." *See Lucero v. Stewart*, 892 F.2d 52, 55 (9th Cir. 1989). It is not necessary to have the photographer establish the foundation for the photograph. Any person sufficiently familiar with the contents of the photograph, such as the individuals and/or the area depicted in the photograph, can be the proponent of its admission. *Id.*; *see also United States v. Henderson*, 241 F.3d 638, 650 (9th Cir. 2000) ("Lay witness may give an opinion regarding the identity of an individual depicted in a photograph provided the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.").

### 3.      Items Found In A Defendant's Possession

Documents or items found in a defendant's possession are admissible, either as adopted admissions or to show the circumstantial relationship of the defendant to the documents. *United States*

*v. Ospina*, 739 F.2d 448, 451 (9th Cir. 1984).  For instance, a calendar or ledger may be a party admission or coconspirator statement, depending upon the circumstances, if the identity of the author of the ledger is reasonably certain.  *United States v. Smith*, 893 F.2d 1573, 1576 (9th Cir. 1990).

### 4. Duplicates

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) under the circumstances, it would be unfair to admit the duplicate instead of the original.  Fed. R. Evid. 1003; *United States v. Smith*, 893 F.2d 1573, 1579 (9th Cir. 1990); *United States v. Leal*, 509 F.2d 122, 125-26 (9th Cir. 1975); *United States v. Pacheco-Lovio*, 463 F.2d 232, 233-34 (9th Cir. 1972); *see also United States v. Skillman*, 922 F.2d 1370, 1375 (9th Cir. 1990) (photocopy bearing extraneous handwriting not connected to the defendant is admissible).

### 5. Business Records

Fed. R. Evid. 803(6) excepts from the hearsay rule "a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."  If evidence meets the requirements for admission under Rule 803(6), no further showing is necessary for admission under the Confrontation Clause.  *See Ohio v. Roberts*, 448 U.S. 56, 66 n.8 (1980); *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990).

A document is admissible under Rule 803(6) if two foundational facts are established: (i) the document was made or transmitted by a person with knowledge at or near the time of the incident recorded, and (ii) the document was kept in the course of a regularly conducted business activity.  *See Ray*, 930 F.2d at 1370; *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702, 717 (9th Cir. 1989), *overruled on other grounds*, *Act Up!/Portland v. Bagley*, 988 F.2d 868 (9th Cir. 1993).  These foundational facts may be established either through a custodian of records or "other qualified witness." The phrase "other qualified witness" is broadly interpreted to require only that the witness understand the record keeping system.  *See Ray*, 930 F.2d at 1370; *United States v. Franco*, 874 F.2d 1136, 1139-

1140 (7th Cir. 1989); *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986). In determining

whether the foundational facts have been established, the court may consider hearsay and other evidence

not admissible at trial. *See* Fed. R. Evid. 104(a), 1101(d)(1); *Bourjaily*, 483 U.S. at 178-79.

The government need not establish precisely when or by whom the document was prepared; all

the rule requires is that the document be made "at or near the time" of the act or event it purports to

record. *See United States v. Huber*, 772 F.2d 585, 591 (9th Cir. 1985); *United States v. Bassey*, 613 F.2d

198, 201 n.1 (9th Cir. 1979). Similarly, challenges to the accuracy or completeness of the business

records ordinarily go to the weight of the evidence and not its admissibility. *See, e.g.*, *La Porta v.*

*United States*, 300 F.2d 878, 880 (9th Cir. 1962).

### 6.    Self-Authenticating Records

In order to accelerate the pace of this trial and to avoid the need to call dozens of witnesses who

would be called to testify to matters that are beyond dispute, the government may seek to introduce a

number of business records, including phone records and medical records, pursuant to Federal Rule of

Evidence 902(11). The Federal Rules of Evidence provide that business records may be admitted into

evidence without a live witness if they are accompanied by a written declaration from a custodian of the

records certifying that the records were made in accordance with the requirements of Rule 803(6) of the

Federal Rules of Evidence. *See Securities Exchange Commission v. Franklin*, 348 F. Supp. 2d 1159

(S.D. Cal. 2004); Rules 803(6) and 902(11), Federal Rules of Evidence.

Specifically, Amended Rule 902 of the Federal Rules of Evidence provides, in pertinent part:

> 902 Self Authentication: Extrinsic evidence of authenticity as a condition
> precedent to admissibility is not required with respect to the following:
>
> . . .
>
> (11) The original or a duplicate of a domestic record of regularly
> conducted activity that would be admissible under Rule 803(6) if
> accompanied by a written declaration of its custodian or other qualified
> person . . . certifying that the record–
>
> (A) was made at or near the time of the occurrence of the matters set forth
> by, or from information transmitted by, a person with knowledge of those
> matters;
>
> (B) was kept in the course of the regularly conducted activity; and
>
> (C) was made by the regularly conducted activity as a regular practice.

> A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

Fed. R. Evid. 902(11) (emphasis added).

### 7.    Charts and Summaries

In an effort to reduce the length of the trial, the government intends to make use of summary witnesses and summary charts to reduce otherwise voluminous records and testimony into a format that is succinct and understandable. Federal Rule of Evidence 1006 provides that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by the parties at a reasonable time and place. The court may order that they be produced in court.

The Advisory Committee Notes to Rule 1006 add that: "[t]he admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury.  The rule recognized this practice, with appropriate safeguards."

A chart or summary may be admitted as evidence where the proponent establishes that the underlying documents are voluminous, admissible and available for inspection.  *See United States v. Meyers*, 847 F.2d 1408, 1411-1412 (9th Cir. 1988); *United States v. Johnson*, 594 F.2d 1253, 1255-1257 (9th Cir. 1979).  While the underlying documents must be "admissible," they need not be admitted." *See Meyers*, 847 F2d at 1412; *Johnson*, 594 F.2d at 239; *Barsky v. United States*, 339 F.2d 180 (9th Cir. 1964).

Summary charts may be used by the government in opening statement.  Indeed, "such charts are often employed in complex conspiracy cases to provide the jury with an outline of what the government will attempt to prove."  *United States v. De Peri*, 778 F.2d 963, 979 (3rd Cir. 1985) (approving government's use of chart); *United States v. Rubino*, 431 F.2d 284, 290 (6th Cir. 1970) (same).

Summary charts need not contain the defendant's version of the evidence and may be given to the jury while a government witness testifies concerning them.  *See United States v. Radseck*, 718 F.2d 233, 239 (7th Cir. 1983); *Barsky*, 339 F.2d at 181.  In addition, summary charts are admissible under

1    Federal Rule of Evidence 611(a), which permits a court to "exercise reasonable control over the mode

2    and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and

3    presentation effective for ascertainment of the truth, (2) avoid needless consumption of time, and (3)

4    protect witnesses from harassment or undue embarrassment." *United States v. Poschatta*, 829 F.2d

5    1477, 1481 (9th Cir. 1987); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980).

6         Typically, charts used under Rule 611(a) for "pedagogical purposes," or as "testimonial aids,"

7    should "not be admitted into evidence or otherwise be used by the jury during deliberations." *United

8    States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991) ("We have long held that such pedagogical devices

9    should be used only as a testimonial aid, and should not be admitted into evidence or otherwise be used

10   by the jury during deliberations."); *see also United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974) (better

11   practice is that charts used as testimonial aids not be submitted to jury).

12        Charts, however, may be used under Rule 611(a) and then subsequently admitted into evidence

13   in those instances in which the defense has had opportunity to challenge the information contained in the

14   chart.  For example, in *Gardner*, the district court admitted, over defense objection, a chart used by a

15   government witness as a testimonial aid that summarized facts and calculations already in evidence.

16   *Gardner*, 611 F.2d at 776.  The Ninth Circuit held that the use of this chart as a testimonial aid was

17   appropriate under Rule 611(a), and that the chart was properly admitted into evidence under Rule 1006:

18   "Having thus utilized the chart without objection with a full opportunity for the defendant to challenge

19   the facts, figures, calculations and underlying documents upon which the chart was based, it was not

20   reversible error to admit the chart in evidence." *Id.* at 776; *see also United States v. Olano*, 62 F.3d

21   1180, 1204 (9th Cir. 1995); *United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993) (charts admitted after

22   court examined them outside presence of jury, defendants had opportunity to review charts and cross-

23   examine witness, and court gave limiting instruction that charts were not themselves substantive

24   evidence).

25        Summary charts of information contained in ledgers and other documents are admissible where

26   the ledgers are available to defendant for inspection.  *United States v. Catabran*, 836 F.2d 453 (9th Cir.

27   1982).  Similarly, a chart summarizing unavailable documents is admissible under Fed. R. Evid. 1004 if

28   the underlying materials are "lost or destroyed" or "not obtainable."  Fed. R. Evid. 1004(1) and 1004(2).

1    A summary witness may properly testify about, and use a chart to summarize, evidence that has

2    already been admitted.  As the Ninth Circuit has recognized, the court and jury are entitled to have a

3    witness "organize and evaluate evidence which is factually complex and fragmentally revealed."  *United*

4    *States v. Shirley*, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of

5    various telephone records, rental receipts, and other previously offered testimony held to be proper

6    summary evidence, as it helped jury organize and evaluate evidence; summary charts properly

7    admitted); *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983).  A summary witness also may

8    rely on the analysis of others as the use of others in the preparation of summary evidence goes to the

9    weight and not the admissibility of the evidence.  *United States v. Soulard*, 730 F.2d 1292, 1299 (9th

10   Cir. 1984); *see Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*, 466 F.2d 722, 727 (7th

11   Cir. 1972) ("It is not necessary . . . that every person who assisted in the preparation of the original

12   records or the summaries be brought to the witness stand.").

13       **B.       Admissibility of Witness Testimony**

14            **1.       Direct and Adopted Admissions by Party Opponent**

15       A statement is not hearsay, but rather constitutes an admission by a party opponent, if the

16   statement is offered against a party and is the party's own statement in either an individual or

17   representative capacity.  Fed. R. Evid. 801(d)(2)(A); *United States v. Burreson*, 643 F.2d 1344, 1349

18   (9th Cir. 1991).  Similarly, a statement made by a party-opponent and offered against that party is not

19   hearsay if it is a "statement of which the party has manifested an adoption or belief in its truth."  Fed. R.

20   Evid. 801(d)(2)(A).  With respect to adoptive admissions, the Court must find sufficient foundational

21   facts that a jury could reasonably conclude that the defendant actually heard; understood and acceded to

22   the statement(s). *Ospina*, 739 F.2d at 451 (writings in residence of defendant and acted upon by

23   defendant are adoptive admissions and therefore nonhearsay); *United States v. Valles-Vallencia*, 811 F.

24   2d 1232, 1237 (9th Cir. 1987) (handwriting on ledgers are adoptive admissions).

25       When the government admits a portion of a defendant's prior statement under Rule 801(d)(2)(A),

26   the defendant may not put in additional out-of-court statements by him because such statements are

27   hearsay when offered by the defendant.  Fed. R. Evid. 801(d)(2); *United States v. Nakai*, 413 F.3d 1019,

28   1022 (9th Cir. 2005) (recognizing that exculpatory out-of-court statements that a defendant makes to a

1   witness constitute inadmissible hearsay) (citing *Williamson v. United States*, 512 U.S. 594, 598-601

2   (1994)); *United States v. Ortega*, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited from

3   eliciting his own exculpatory statements during cross examination of government agent because to

4   permit otherwise would be to put such statements "before the jury without subjecting [defendant] to

5   cross-examination, precisely what the hearsay rule forbids."); *United States v. Fernandez*, 839 F.2d at

6   639, 640 (9th Cir. 1988) (same).

7          The only potential limitation of this principle is the "rule of completeness" set forth in Federal

8   Rule of Evidence 106, which has been applied by some courts to require that all of a defendant's prior

9   statements be admitted where it is necessary to place an admitted statement in context or to avoid

10  misleading the trier of fact.  It is entirely proper, however, to admit segments of a statement without

11  including everything, and adverse parties are not entitled to offer additional statements just because they

12  are there and the proponent has not offered them.  *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir.

13  1996); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). Furthermore, Rule 106 does not render

14  admissible evidence which is otherwise inadmissible under the hearsay rules.  *See Collicott*, 92 F.3d at

15  983 (hearsay not admitted regardless of Rule 106).

16                 **2.      Confession of a Co-Defendant/*Bruton* Considerations**

17          While a defendant's own admissions may be offered against him under Rule 801(d)(2)(A), a

18  defendant is deprived of his Sixth Amendment right to confrontation when a non-testifying

19  codefendant's confession that implicates the defendant is introduced in a joint trial, even if the jury is

20  instructed to consider that confession only against the co-defendant.  *Bruton v. United States*, 391 U.S.

21  123, 135-36 (1968).  However, a mutually inculpatory confession by a non-testifying defendant can be

22  introduced in a joint trial provided that a proper limiting instruction is given and "the confession is

23  redacted to eliminate not only the defendant's name, but any reference to his or her existence."

24  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  In addition, a confession by a non-testifying co-

25  defendant may properly be considered by the trier of fact if it does not expressly implicate another

26  defendant but rather becomes incriminating only after it is linked with other evidence introduced at trial.

27  *Id.* at 208-09.

28          In *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004), the Supreme Court distinguished

between "testimonial" and "nontestimonial" hearsay evidence and held that the admission of "testimonial" hearsay statements violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford* further held that co-conspirator statements are not testimonial in nature. 541 U.S. at 74. The Ninth Circuit has also reiterated that "co-conspirator statements are not testimonial and therefore beyond the compass of *Crawford*'s holding." *United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005) (citing *Crawford*, 541 U.S. at 68 (describing "statements in furtherance of conspiracy" as "statements that by their nature [are] not testimonial")); *see also United States v. Bridgeforth*, 441 F.3d 864, 869 (9th Cir. 2006) ("[I]f a statement is admissible under Rule 80l(d) (2) (E), the defendant's right of confrontation is not violated."). Thus, co-conspirator statements are exempted from the *Crawford* analysis. They are also exempted from the *Bruton* analysis: "*Bruton* precludes the admission of a defendant's confession implicating a co-defendant during a joint trial." 425 F.3d at 1235 n.5. A "statement made by a co-conspirator during and in furtherance of the conspiracy and thus [is] not barred by *Bruton*." *Id.*; *see also United States v. McCown*, 711 F.2d 1441, 1448 (9th Cir. 1983) (holding *Bruton* inapplicable to statements made by a co-conspirator in furtherance of a conspiracy).

### 3.   Hearsay

#### (i)   Definition

Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

#### (ii)   Statements Not Introduced for the Truth of the Matter Asserted (e.g., Effect on Hearer)

Statements offered for the effect they have on the hearer (e.g., to show a party's knowledge) are not hearsay. *United States v. Castro*, 887 F.2d 998, 1000 (9th Cir. 1987); *Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953, 960 n.4 (9th Cir. 2001). A witness also may testify to what he or she understood a declarant to mean with respect to a statement made by the declarant to the witness. *United States v. Brooks*, 473 F.2d 817, 818 (9th Cir. 1973) (per curiam).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### (iii)    State of Mind Exception

Federal Rule of Evidence 803(3) provides that the hearsay rule does not exclude a "statement of the declarant's then existing state of mind." Fed. R. Evid. 803(3).  The three factors bearing on the foundational inquiry on admissibility under Federal Rule of Evidence 803(3) are contemporaneousness, chance for reflection, and relevance.  *United States v. Miller*, 874 F.2d 1255, 1264 (9th Cir. 1989) (upholding exclusion of defendant's statement about his state of mind two hours prior to the statement because of chance for reflection and opportunity to fabricate).

### (iv)    Prior Inconsistent Statements

Prior inconsistent statements of a non-defendant witness are admissible for impeachment purposes under Federal Rule of Evidence 613.  *See* Fed. R. Evid. 613(a), (b).  In addition, such statements are admissible as substantive evidence offered for the truth of the matter asserted provided that the foundational requirements set forth in Federal Rule of Evidence 801(d)(1) are satisfied.  *United States v. Armijo*, 5 F.3d 1229, 1232 (9th Cir. 1993).  Under Rule 801(d)(1), a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Fed. R. Evid. 801(d)(1).

### (v)    Prior Consistent Statements

Under Federal Rule of Evidence 801(d)(1)(B)(i), an out-of-court statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B)(i); *see United States v. Bao*, 189 F.3d 860, 864 (9th Cir. 1999); *United States v. Frederick*, 78 F.3d 1370, 1377 (9th Cir. 1996); *United States v. Stuart*, 718 F.2d 931, 934 (9th Cir. 1983).

To establish the admissibility of a prior consistent statement under Rule 801(d)(1)(B)(i), the following foundational factors must be satisfied: "(1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent

statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior

consistent statement must be made prior to the time that the supposed motive to falsify arose." *Collicott*,

92 F.3d at 979.

In 2014, Rule 801(d) was amended to expand the scope of prior consistent statements that can be

admitted.  In addition to statements to address claims of recent fabrication, the Rule now permits the

admission of a prior statement that is "consistent with the declarant's testimony and is offered to

rehabilitate the declarant's credibility as a witness when attacked on *another ground*."  *Id.* (emphasis

added).  The Advisory Committee Notes provide two examples of such attacks—"what otherwise

appears to be an inconsistency in the witness's testimony" and "a charge of faulty memory."  Fed. R.

Evid. 801, Advisory Committee Notes, 2014 Amendments.

### 4.      Hostile Witnesses

The government may seek permission to use leading questions in addressing certain witnesses

who have close ties to, or who otherwise are aligned with, certain defendants.  Under Federal Rule of

Evidence 611(c), "when a party calls a hostile witness, an adverse party, or a witness identified with an

adverse party, interrogation may be by leading questions."  Fed. R. Evid. 611(c).  Although prior to Rule

611(c)'s adoption, a party wishing to ask leading questions on direct examination had to show "actual

hostility" by the witness or that the witness was an adverse party, Rule 611(c) "significantly enlarged the

class of witnesses presumed hostile, and therefore subject to interrogation by leading questions without

further showing of actual hostility."  *Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467, 1477-78 (11th

Cir. 1984) (internal quotation marks omitted).  A trial court has broad discretion in determining whether

a particular witness should be deemed a hostile witness for purposes of this rule.  *See United States v.

Goode*, 814 F.2d 1353, 1355 (9th Cir. 1987).

### 5.      Witness Invocation of The Fifth Amendment Right Against Self Incrimination

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to

be a witness against himself."  U.S. CONST. Amend. V. The Fifth Amendment protects a defendant

from making statements that are: (1) compelled; (2) testimonial; and (3) self-incriminating.  The

Supreme Court has held that compelled testimony, such as sworn trial testimony, is self-incriminating if

1  reasonable cause exists to believe that the testimony either would support a conviction or would provide

2  a link in the chain of evidence leading to a conviction.  *United States v. Hoffman*, 341 U.S. 479, 486

3  (1951).  If, however, the threat of future prosecution is "remote, unlikely or speculative, the privilege

4  does not apply." *United States v. Antelope*, 395 F.3d 1128, 1134 (9th Cir. 2005) (*citing Brown v.*

5  *Walker*, 161 U.S. 591, 596-97 (1896) for proposition that Fifth Amendment protection does not properly

6  extend to offenses for which the statute of limitations has run); *see also United States v. Vavages*, 151

7  F.3d 1185, 1192 (9th Cir. 1998) (noting that "fear of perjury can typically form a valid basis for

8  invoking the Fifth Amendment only where the risk of prosecution is for perjury of the witness' past

9  testimony" and finding "a witness may not claim the privilege of the Fifth Amendment out of fear that

10  he will be prosecuted for perjury for what he is about to say. The shield against self-incrimination in

11  such a situation is to testify truthfully, not to refuse to testify on the basis that the witness may be

12  prosecuted for a lie not yet told.").

13     Non-defendant witnesses cannot avoid testifying at trial through a blanket invocation of the Fifth

14  Amendment privilege against self-incrimination.  *Antelope*, 395 F.3d at 1134.  Instead, in instances in

15  which the witness has provided the government with advance notice of the intent to invoke the Fifth

16  Amendment privilege against self-incrimination, the witness should be questioned on the stand, but

17  outside the presence of the jury, to determine whether the invocation is appropriate.  *Vavages*, 151 F.3d

18  at 1192.  Moreover, in the event that a non-defendant witness properly invokes the Fifth Amendment,

19  the government can compel the witness to testify through the issuance of use immunity to that witness.

20  *United States v. Doe*, 125 F.3d 1249, 1252, 1254 (9th Cir. 1997).

21          **6.     Cross-Examination of Defendant**

22     A defendant who testifies at trial waives his right against self-incrimination and subjects himself

23  to cross-examination concerning all matters reasonably related to the subject matter of his testimony.

24  The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination.  *United*

25  *States v. Cuozzo*, 962 F.2d 945, 948 (9th Cir. 1992); *United States v. Black*, 767 F.2d 1334, 1341 (9th

26  Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of

27  permissible cross-examination or his waiver.  Rather, the inquiry is whether 'the government's questions

28  are reasonably related' to the subjects covered by the defendant's testimony").  While Federal Rule of

Evidence 404(b) "restricts the use of evidence solely for purposes of demonstrating a criminal proclivity, [i]t does not proscribe the use of other act evidence as an impeachment tool during cross-examination." *United States v. Gay*, 967 F.2d 322, 328 (9th Cir. 1992).  Furthermore, Federal Rule of Evidence 609(a) permits the credibility of a defendant to be impeached by evidence of felony convictions of the defendant or any crimes involving dishonesty or false statements, provided that the conviction was sustained or the defendant was released from prison on the conviction within the past ten years.

### 7.      Cross Examination - General Witnesses

Under Federal Rule of Evidence 608, the credibility of a witness may be supported or attacked by evidence in the form of: (1) prior fraud convictions; (2) prior felony convictions sustained within the past ten years; and (3) opinion or reputation testimony provided that the testimony refers only to the witness' character for truthfulness or untruthfulness.  Fed. R. Evid. 608.  Moreover, reputation or opinion evidence relating to truthfulness may only be admitted if the witness' character for truthfulness has been attacked. Fed. R. Evid. 608(a).  Similarly, specific instances of conduct of a witness may, in the court's discretion, be inquired into on cross-examination of the witness only if the conduct concerns his character for truthfulness or untruthfulness.  Such conduct, however, may not be proven by extrinsic evidence.  Fed. R. Evid. 608(b).

### 8.      Defendant's Character Witnesses

The Supreme Court has recognized that character evidence—particularly cumulative character evidence—has weak probative value and great potential to result in confusion of the issues and prejudice the jury.  *Michelson v. United States*, 335 U.S. 469, 480, 486 (1948).  The Court has thus given trial courts wide discretion to limit the presentation of character evidence.  *Id.* at 486.

Rule 404(a) of the Federal Rules of Evidence governs the admissibility of character evidence. Rule 404(a) permits a defendant to introduce evidence of a "pertinent" trait of character. For example, evidence of defendant's family or employment status is irrelevant to whether defendant is believable and law-abiding, and is thus inadmissible.  *See United States v. Santana-Camacho*, 931 F.2d 966, 967-68 (1st Cir. 1991) (testimony of defendant's daughter purportedly showing that defendant was a good family man was inadmissible character evidence inasmuch as such character traits were not pertinent to

1   charged crime of illegally bringing aliens into the United States).

2   Moreover, the form of the proffered character evidence must be proper.  Federal Rule of

3   Evidence 405(a) sets forth the sole methods by which character evidence may be introduced.  It

4   specifically states that where evidence of a character trait is admissible, proof may be made in two ways:

5   (1) by testimony as to reputation; and (2) by testimony as to opinion.  Thus, defendant may not introduce

6   specific instances of his good conduct through the testimony of others.  *Michelson*, 335 U.S. at 477

7   ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of

8   a particular disposition or of benign mental and moral traits.").

9   On cross-examination of a defendant's character witness, however, the government may inquire

10  into specific instances of a defendant's past conduct relevant to the character trait at issue.  *See* Fed. R.

11  Evid. 405(a).  In particular, a defendant's character witnesses may be cross-examined about their

12  knowledge of the defendant's past crimes, wrongful acts, and arrests.  *See Michelson*, 335 U.S. at 481.

13  The only prerequisite is that there must be a good-faith basis that the incidents inquired about are

14  relevant to the character trait at issue.  *See United States v. McCollom*, 664 F.2d 56, 58 (5th Cir. 1981).

15        **9.    Defendant's Testimony Regarding Character/Impeachment By Contradiction**

16

17  Unlike character witnesses, who must restrict their testimony to opinion or appraisal of a

18  defendant's reputation, a defendant-witness may cite specific instances of conduct as proof that he

19  possessed a relevant character trait.  *United States v. Giese*, 597 F.2d 1170, 1190 (9th Cir. 1979).

20  However, "[o]nce a witness (especially a defendant-witness) testifies as to any specific fact on direct

21  testimony, the trial judge has broad discretion to admit extrinsic evidence tending to contradict the

22  specific statement, even if such statement concerns a collateral matter in the case."  *Id.* at 1190 (citation

23  omitted).  Thus, if defendant testifies to specific instances of conduct supportive of good character, he

24  opens the door to rebuttal evidence on all reasonably related matters, be they "collateral" or not.[6]  *Giese*,

25

26       [6] The distinction between the proper use of extrinsic evidence to impeach by contradiction under Rule 607 and the impermissible use of extrinsic evidence under Rule 608 was explained by the Ninth

27  Circuit in *United States v. Castillo*, 181 F.3d 1129 (9th Cir. 1999).  As the *Castillo* court noted, Rule 608(b) prohibits the use of extrinsic evidence of conduct to impeach a witness's credibility in terms of

28  his general veracity.  In contrast, the concept of impeachment by contradiction permits courts to admit extrinsic evidence that specific testimony is false, because it is contradicted by other evidence.

597 F.2d at 1190.

### C.    Miscellaneous

#### 1.    Judicial Notice

Federal Rule of Evidence 201 provides that, if requested by a party and supplied with the necessary information, a court must take judicial notice of facts that are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Judicial notice may be taken at any stage of the proceedings.  For example, the Ninth Circuit has ruled that materials from proceedings in another tribunal are appropriate for judicial notice under Federal Rule of Evidence 201.  *Biggs v. Terhune*, 334 F.3d 910, 916 n.3 (9th Cir. 2003) (The court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed); Fed. R. Evid. 201.

#### 2.    Reciprocal Discovery

The government has requested reciprocal discovery.  No reciprocal discovery has been provided with the exception of expert disclosures from Defendant Wendt regarding rebuttal DNA expert witness Dr. Dan Krane and a medical expert, Dr. Martin Chenevert, from the Nelson defense.  The Wendt defense has recently suggested that it has obtained work records that may serve as a partial alibi to the VICAR murder charge, but they have not yet produced them.  To the extent that there exists reciprocal discovery to which the government is entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure and which the defense has not produced prior to trial, the government reserves the right to seek to have such documents or other evidence precluded should a defendant attempt to introduce or use them at trial.  *See United States v. Young*, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

#### 3.    Waiver of Rule 12(b) Motions

Federal Rule of Criminal Procedure 12(b)(3) requires that defenses and objections based on

defects in the institution of the prosecution, defenses and objections based on defects in the indictment or information, motions to suppress evidence, and requests for discovery under Rule 16 be raised prior to trial.  A defendant's failure to raise any such motions prior to trial constitutes waiver, and the Court should not allow any such motions to be brought after jeopardy has attached.  Fed. R. Crim. Pro. 12(e); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1996); *United States v. Miller*, 984 F.2d 1028 (9th Cir. 1993).

DATED: April 5, 2022                              Respectfully submitted,

                                                  STEPHANIE M. HINDS
                                                  United States Attorney


                                                  _____/s/_____
                                                  KEVIN J. BARRY
                                                  AJAY KRISHNAMURTHY
                                                  LINA Y. PENG
                                                  Assistant United States Attorneys