ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
AJAY KRISHNAMURTHY (CABN 305533)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone: (415) 436-6840
   FAX: (415) 436-7234
   Email; kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>RUSSELL OTT, et al.,<br><br>    Defendants. | CASE NO. 17-CR-0533 EMC<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Hearing Date: June 13, 2024<br>Hearing Time: 9:15 am<br><br>Hon. Edward M. Chen |

**INTRODUCTION**

Defendant Russell Ott stands before the Court to be sentenced following his conviction at trial for charges of Racketeering Conspiracy (Count One); Conspiracy to Commit Murder in Aid of Racketeering (Count Two); and Murder in Aid of Racketeering (Count Three). Count Three, the VICAR murder conviction, carries a mandatory term of life imprisonment; Count One, RICO conspiracy, carries a maximum term of life; and Count Two, conspiracy to commit VICAR murder, carries a maximum term of 10 years' imprisonment.

Ott has a been a member of the Sonoma County charter of the Hells Angels (HASC) for over 40 years; he helped set the tone of criminality for the enterprise since its inception to the present; he was a

leader of the organization as president; he retained significant influence during the period at issue in this case; and he played a critical role in the killing of HASC member Joel Silva for violating Hells Angels rules. Because of the nature of the crimes, and consistent with the recommendation of United States Probation, in addition to the mandatory life term for Count Three, the Court should sentence Defendant Ott to the statutory maximum terms for the other counts of conviction: life for Count One, and a concurrent 120-month term for Count Two.

## DEFENDANT'S OFFENSE CONDUCT

The Hells Angels are a transnational outlaw motorcycle gang, and the Hells Angels Sonoma County chapter (HASC) is a subset of that organization whose members primarily operate in Sonoma County and the surrounding area. As the evidence at trial established, HASC engaged in a host of criminal activities, and its members engaged in a conspiracy to conduct its affairs as a criminal enterprise. The objectives of the conspiracy included to preserve and protect the power, territory, reputation, and profits of HASC through the use of intimidation, violence, threats of violence, and assaults; promoting and enhancing HASC and the activities of its members and associates; and keeping victims, potential victims, and community members in fear of HASC and its members and associates through violence and threats of violence.

As the former president of HASC and an powerful member of the enterprise during the timeframe of this case, Ott was aware of what HASC did; he was considered someone who could be relied on for in a time of war; and he directly participated in the most serious act of violence in this case, the murder of Joel Silva.

## SENTENCING GUIDELINES CALCULATION

The government accepts the calculation of the Sentencing Guidelines for Defendant's offense conduct in the Presentence Report. That calculation is as follows:

GROUP ONE: Racketeering Conspiracy (Count 1); Conspiracy to Commit Murder in Aid of Racketeering (Count 2); Murder in Aid of Racketeering (Count Three)

1. <u>Racketeering Act 1: Conspiracy to murder rivals</u>
   a. Base offense level:                                      33
      (USSG § 2A1.5)
   b. Total offense level:                                   **33**

| | | | | |
|---|---|---|---|---|
| 2. | Racketeering Act 2: VICAR Murder of Joel Silva and Conspiracy to Murder Silva | | | |
| | a. | Base offense level: (USSG §§ 2E1.3(a)(2) and 2A1.1(a)) | | 43 |
| | b. | Total offense level: | | **43** |
| 3 | Racketeering Act 3: August 2015 Extortion of Steve Verhagen | | | |
| | a. | Base offense level: (USSG § 2B3.2(a)) | | 18 |
| | b. | Specific Offense Characteristics: (USSG § 2B3.2(b)(1) – Express / implied threat) | | +2 |
| | | (USSG § 2B3.2(b)(1)(3)(B)(ii) – Ability to carry out threat) | | +3 |
| | c. | Total offense level: | | **23** |
| 4. | Racketeering Act 4: November 26, 2016 Extortion of Troy Conte | | | |
| | a. | Base offense level: (USSG § 2B3.2(a)) | | 18 |
| | b. | Specific Offense Characteristics: (USSG § 2B3.2(b)(1) – Express / implied threat) | | +2 |
| | | (USSG § 2B3.2(b)(1)(3)(B)(ii) – Ability to carry out threat) | | +3 |
| | c. | Total offense level: | | **23** |
| 5. | Racketeering Act 5: January 15, 2015 Nicholas Spencer / Nicholas Gruber Robbery | | | |
| | a. | Base offense level: (USSG § 2B3.1(a)) | | 20 |
| | b. | Specific Offense Characteristics: (USSG § 2B3.1(b)(2)(B) – Firearm otherwise used) | | +6 |
| | c. | Specific Offense Characteristics: (USSG § 2B3.1(b)(3)(A) – Bodily injury) | | +2 |
| | d. | Specific Offense Characteristics: (USSG § 2B3.1(b)(6) – Controlled substance taken) | | +1 |
| | e. | Total offense level: | | **29** |
| 6. | Racketeering Act 6: December 16, 2016 Eban Hale Robbery | | | |
| | a. | Base offense level: (USSG § 2B3.1(a)) | | 20 |
| | b. | Specific Offense Characteristics: (USSG § 2B3.1(b)(2)(C) – Firearm brandished) | | +5 |
| | c. | Specific Offense Characteristics: | | +1 |

|  | (USSG § 2B3.1(b)(6) – Controlled substance taken) | |
|---|---|---|
|  | (USSG § 2B3.1(b)(7)(C) – Demand of more than $95,000) | +2 |
| d. | Total offense level: | **28** |

7. Grouping Calculation
   a. Offense level 43 is the only Group that is calculated     **43**

8. **Total Offense Level:**                                     **43**

The Presentence Report correctly calculated that Defendant has one criminal history point, establishing his CHC level as I.  At an adjusted offense level of 43 and a CHC I, the Guidelines range is life.

## SECTION 3553(A) FACTORS

The factors listed under 18 U.S.C. § 3553(a) direct the Court to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The key factors in this case are the nature and circumstances of the offense, 3553(a)(1); the need to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense, 3553(a)(2)(A); and the need for deterrence, 3553(a)(2)(B).  These factors require a Guidelines sentence of life for Counts One and Three and a concurrent term of 120 months for Count Two.

**The Nature of HASC**

As both trials in this case demonstrated, HASC has been a scourge on the community.  The Hells Angels are a group that enforces its rules and its territory through violence, and it venerates and celebrates those who commit violence on its behalf, such as through the "Filthy Few" patch.  The Court heard and saw a number of examples of how HASC and its members and associates used violence to project its influence and to demand respect.  HASC has contempt for the law and the police, as seen in its historical documents; its interactions with law enforcement officers; its membership rules; and its acts of witness intimidation and obstruction of justice.  Indeed, the concept of "no snitching" is literally central to its ethos, as this edict is represented by the stitched-shut mouth on the death head patch that is in the middle of every Hells Angels cut.

The evidence in this case firmly established that violence was the lifeblood of the enterprise. Everyone associated with HASC knew that violent clashes with rivals were an ever-present possibility, a reality brought home most powerfully by the murder of San Francisco Hells Angels president and HASC associate Mark Guardado in 2008. This was seen in by the enterprise's reaction to this event, by the presence of firearms carried by HASC members, by guns in the HASC clubhouse, and by the fortification of the HASC clubhouse over time. As former HASC officer Troy Conte bluntly stated in the Group Two trial, a member who was not willing to kill for the patch would be kicked out of the enterprise.

Violence was not reserved only for rivals, however. Hells Angels who violated enterprise rules were subject to brutal reprisals, as shown by the planned attack on Sacramento member Joey Fats, by the savage beating of Troy Conte, and, of course, by the murder of Joel Silva. Members of HASC puppet clubs were beaten for violation of HASC rules, and members of the public were attacked for even the most trivial displays of perceived disrespect. This was demonstrated by the existence and use of "crime scene cleanup kits," the discovery of knives within the clubhouse that had been "washed with bleach," and the many instances of assault.

A member of the public could be struck unconscious for knocking a Hells Angels vest off a barstool. Chatting up a member's old lady or girlfriend at a bar or a concert was provocation enough for an attack. In fact, Troy Conte recounted knocking out a member of the public as a favor to the victim, because after this person disrespected Raymond Foakes, Conte believed the person would be beaten even more severely if he had not intervened. Bumping into a Hells Angel at a bar and refusing to back down led to a group attack, where the victim was stomped on the ground and his head kicked like a soccer ball. Failing to yield to Hells Angels on the freeway resulted in being run off the road, and passing a Hells Angels pack resulted in a beating in front of families with children.

The pervasive nature of HASC violence is what made its efforts at extortion and witness intimidation so successful. HASC members could act with impunity because they knew that their threats to victims and other witnesses to keep quiet about what happened to them would be effective. And they were. But for the sexual assault of M.C., Troy Conte would likely have simply accepted his savage beating and gone on with his life as a "bad out"—assuming Foakes didn't take further action

against him once he was a civilian. Similarly, none of the following victims—Javad Trew, Mariano Malvino, Eban Hale, Nicholas Spencer, Nicholas Gruber, or M.J.—reported the HASC assaults and robberies when they happened.

HASC could successfully extort motorcycles from former prospects and members—bikes worth tens of thousands of dollars—because those HASC members and associates knew exactly what would happen to them if they resisted. As just one example, the violent reputation of HASC is what enabled members to view the payment of $30,000 worth of marijuana for protection as a "gift," instead of extortion.

**The Need for General Deterrence**

The Court needs to impose lengthy sentences for the Group One defendants, like Ott, for RICO conspiracy and the related crimes not only to incapacitate and deter these individuals, but for general deterrence as well.

General deterrence matters in criminal cases. For instance, a 30-year sentence for a person who assaulted the family member of a government leader serves as a deterrent to people who would use violence for political ends. As the Court saw in this case, the arrest and charging of HASC members, including leaders like Jonathan Nelson, Ott, Raymond Foakes, and prominent HASC associates like Brian Wendt, created a virtuous circle. The Court heard from crime victims who were so terrified of retribution that they didn't seek medical treatment for serious injuries. In the Group Two trial, the Court heard from a person who had been beaten for speaking with Raymond Foakes' former girlfriend. Because the Hells Angels were involved, he refused to identify his attacker—HASC member Jeremy Greer, who was arrested near the scene—and for months afterward, he inspected his vehicle, looking for bombs. However, after this case was charged, witnesses became more willing, or at least less resistant, to talk about what HASC had done to them. Seeing that action was being taken against HASC encouraged people to come forward. The charges lessened the sense of impunity, and other members of the public were willing to share what HASC had done to them as well.

A sentence that reflects the violent and dangerous nature of HASC will send a similar message to the community. Criminal enterprises like HASC are a serious threat to the public, and the Court should treat them as such by deterring others from associating with them or supporting their criminal work.

**Defendant Ott's Conduct**

During the trial, the Ott defense repeated the theme that many of the overt acts presented did not involve action by Ott, and they implied this was because he an old man incapacitated by alcohol—someone whom prospects were required to chaperone on "Rusty Watch." But this does not accurately reflect Ott's true role within HASC. Ott has been an intelligent, powerful, and influential figure in the organization since its inception. As a founding member, he was in many ways responsible for setting the tone that led to the acts presented at trial. The written history of HASC's origins, in which Ott is repeatedly featured, discusses acts of violence by HASC founders such as assault, threatening of law enforcement officers, shootings, and murder. The tone of the discussion is both proud and casual. Further, Ott has acknowledged the prominence he had within the enterprise. "The evidence at trial showed that Mr. Ott was a well respected member of the Sonoma County charter[.] He was one of the original members, he served as president of the charter for many years and his reasoning and advice was valued by charter members." ECF No. 3032 at 35 (Ott's Post-trial motions).

With respect to his role in the enterprise, the jury heard that Ott told Steve Verhagen that at one time, no one lived or died in Sonoma County without his permission. Ott referred to himself as "the Chief," and Ott made it clear to that he would always be in control and he was always the Chief. Ott's influence even after he no longer was president was echoed by Troy Conte, who testified that Ott remained respected; he had a "good voice for the club, good advice, leadership"; and people listened to him when he spoke. Hells Angels from other charters who associated with HASC also held him in esteem and acknowledged his prominence. Verhagen described the deference accorded to Ott during an event at the Fresno Hells Angels clubhouse, and Richmond member Joseph Hardisty recognized Ott as a "killer," one of the people Hardisty would want with him if the Hells Angels went to war.

Although the jury did not hear evidence that Ott took part in the acts of extortion, the robberies, or the beatings that were presented in this case, there is no question that Ott knew about, benefitted from, and sanctioned them. For instance, Ott argued that he played no part in the savage beating of Troy Conte. But Ott walked out of the club house after the assault had already started, knowing full well that former members like Conte could be brutally beaten out of the club. Ott—a senior, well-respected

member of the enterprise—could have intervened. His failure to do so demonstrated his tacit support for HASC's culture of violence.

Moreover, Ott benefitted from every motorcycle extorted from all the prospects who washed out and from all the members who were expelled for various reasons. When robbery proceeds were shared with the enterprise—like from the Spencer/Gruber home invasion, Ott benefitted, as he did when the club skimmed proceeds from toy runs. Like all HASC members, Ott benefitted with every payment made to the enterprise by their puppet clubs and others who provided money and support through intimidation. The well-earned reputation for violence and the acts of witness intimidation allowed Ott to act with the same impunity as other HASC members. He could commit crimes like the Silva homicide secure in the belief that he would get away with it.

The killing of Joel Silva, of course, is the most significant of Ott's criminal activities with HASC, and the facts of that case indicate why a maximum sentence for RICO conspiracy and conspiracy to commit VICAR murder is called for here. It is true that Ott did not end Joel Silva's life by pulling the trigger. His role was critical, however. Without Ott exploiting the trust Silva placed in him through their long-standing brotherhood in HASC and through Ott's status as an "uncle" to Silva's young children, the plot to kill him would not have worked.

After the events of Laconia in June 2014, Joel Silva knew that he was in danger. His family described him as being on edge, worried, not himself. Silva knew that the Hells Angels might kill him, which is one of the reasons that Nelson directed Joseph Hardisty to move to Sonoma County to put Silva at ease so he could be killed. After Hardisty balked and left the conspiracy, Nelson developed a plan to lure Silva to Fresno under the pretense of resolving his issues. Silva remained skeptical, however, even as he agreed to the trip. He communicated his unease and forecast his possible death in his last words to his family, letting them know that he had to go to Fresno; that he was not sure how it would work out; and that if he disappeared and the club told them he ran, he didn't run. Silva's fear about what could happen to him was also shown in his behavior with his wife. In the second trial, she testified about the unusual tenderness he showed to her the night before he left for Fresno, which can be seen as a way of saying goodbye.

The stage was set for Silva's death in Fresno. The clubhouse is in an industrial area, it had an arsenal of firearms, and the building was riddled with bulletholes, so the sound of another gunshot would make little difference. There were concrete floors, rolls of plastic sheeting in a storage shed in the back, and there was a large roll-up door to bring vehicles in and out. And Merl Hefferman had begun efforts to contact his connection at the crematory to make sure that facility was available for Silva's body. All the conspirators needed was to get Silva to Fresno, and for that, they turned to Ott.

Many witnesses testified to the fact that Silva and Ott were very close, and given Silva's paranoia, HASC needed someone whom Silva trusted to persuade him to put himself at risk and make the trip to Fresno. Given their long and close relationship, Ott was the obvious choice. Without Ott to travel with Silva to Fresno, the killing would not have taken place. To stop it, Ott had several options. First, he could have declined to play a role. As Hardisty did, Ott could have decided to let the situation play out without his assistance. Because Silva's mental state meant that Ott's relationship to him was so critical, and in light of the failure of the initial plan, this likely would have been the end of it. Normal procedure would have been invoked and Silva would have been violently beaten out of HASC instead.

Second, Ott could have given a quiet word of warning to Silva. This would have confirmed the fears that Silva expressed to his family, and he would have been able to flee if he chose to.

Third, Ott could have changed his mind on the way to Fresno and told Silva to drop him off somewhere and keep driving. He did not. Instead, Ott chose to keep to the plan as he sat across the seat from Silva. He kept to the plan during the entire four-hour trip to the Fresno clubhouse, as Silva was calling and texting Nelson, Wendt, and others. During every lull in conversation and in response to every statement or question by Silva, Ott gave Silva no clue what was waiting for him. Ott's position with HASC was more important to him than Silva's life. For that reason, and for all the other harm that HASC has done to the community, the Court should impose the maximum terms on Counts One and Two.

//
//
//
//

# CONCLUSION

For the foregoing reasons, and for all the reasons set forth in the two trials in this case, the government respectfully submits that the Court should sentence Defendant Russell Ott to a term of life for Counts One and Three and a concurrent term of 120 months for Count Two.

DATED: June 7, 2024                                         Respectfully submitted,

                                                            ISMAIL J. RAMSEY
                                                            United States Attorney

                                                            __/s/ *Kevin J. Barry*_____
                                                            KEVIN J. BARRY
                                                            AJAY KRISHNAMURTHY
                                                            Assistant United States Attorneys